# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **PACIFICA MECHANICSBURG LLC,** | : | |
| **Plaintiff,** | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | **No. _____** |
| | : | |
| **BJ'S WHOLESALE CLUB, INC.,** | : | |
| **Defendant.** | : | |

## <u>COMPLAINT</u>

Plaintiff Pacifica Mechanicsburg LLC, through its counsel, Saxton & Stump LLC, files this Complaint against BJ's Wholesale Club, Inc., as follows:

### PARTIES

1.     Plaintiff Pacifica Mechanicsburg LLC ("Pacifica") is a Pennsylvania limited liability company with its principal place of business located at 1775 Hancock Street, Suite 200, San Diego, California 92110. All members of Pacifica are citizens of the state of California.

2.     Defendant BJ's Wholesale Club, Inc. ("BJ's"), is a Delaware business corporation with its principal place of business located at 25 Research Drive, Westborough, Massachusetts 01581.

### JURISDICTION AND VENUE

3.     This Court has subject-matter jurisdiction over this civil action pursuant to 28 U.S.C.§ 1332 because the parties are domiciled in different states and the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs.

4.     Venue is proper in this District Court pursuant to 28 U.S.C. § 1391 in that this is a judicial district in which a substantial part of the events or omissions giving rise to the claim

occurred, or a substantial part of property that is the subject of the action is situated.

Additionally, for venue purposes BJ's is deemed to reside in this judicial district and is subject to

this Court's personal jurisdiction as BJ's contacts are sufficient to subject it to personal

jurisdiction with respect to this civil action.

## FACTUAL BACKGROUND

5.    Pacifica is a family-owned real estate development company that owns certain

commercial real estate located at the intersection of the Carlisle Pike (U.S. Route 11 –

Legislative Route No. 34) and Crossgate Drive in Hampden Township, Cumberland County,

Pennsylvania (the "Property").

6.    As of the filing of this Complaint, Pacifica is completing the development of the

Property into a retail shopping center known as Beltway Towne Centre.

7.    BJ's is a membership-only wholesale club retailer that operates clubs at locations

throughout the United States.

8.    Prior to on or about August 1, 2025, BJ's operated a club in Camp Hill,

Cumberland County, Pennsylvania.

9.    On August 1, 2025, BJ's opened a new club at the Property pursuant to a written

Lease with Pacifica.

10.    The terms of the written Lease are described in more detail below, but in general,

BJ's was to lease from Pacifica certain portions of the Property on which BJ's was to design and

construct its warehouse club, a gas station, and a propane tank refill station. Pacifica was to

perform certain site construction work, including constructing certain building pads on which

BJ's was to construct its warehouse club building, gas station, and propane refill station. BJ's and

Pacifica's design and construction work collectively will be referred to in this Complaint as the "Project."

11.     The road to the opening of the BJ's club on the Property was rocky as BJ's regularly and repeatedly injected delays into the Project and then tried to blame those delays on Pacifica.

12.     Rather than cooperating with Pacifica to solve the problems BJ's created, BJ's instead flexed its corporate muscle and its perceived superior bargaining power to intimidate Pacifica into capitulating to BJ's demands, including without limitation assuming responsibility for things that were not Pacifica's responsibility under the terms of the Lease.

13.     As explained in more detail below, BJ's caused repeated and long-lasting delays in obtaining required approvals for the Project, did not construct its building in accordance with the approved plans, and otherwise interfered with the progress of Pacifica's work.

14.     The BJ's-caused delays required Pacifica to incur costs accelerating certain elements of the work to satisfy arbitrary dates dictated by BJ's, performing work not required by the Lease, designing and redesigning site improvements, and removing and replacing work already in place to correct for deficiencies in BJ's work. Additionally, the BJ's-caused delays prevented Pacifica from collecting rent within the timeframe anticipated under the Lease, while still incurring substantial financing costs and losing the time value of substantial sums of money.

15.     The anticipated construction timeline when BJ's and Pacifica executed the original lease would have had Pacifica performing its outdoor construction activities during a typical central Pennsylvania outdoor construction season. But the BJ's-caused delays pushed Pacifica's work into the winter of 2024-2025, which was especially cold with months of frozen ground upon which sitework construction could not be performed.

3

16.     Patrick Netreba, BJ's Director of Real Estate, was Pacifica's main BJ's contact. When confronted with problems caused by BJ's, Netreba was spring-loaded to immediately deny liability without any investigation or inquiry of the BJ's people in the field. Consistently during the Project, when confronted with a problem, Netreba initially pushed back hard and made baseless threats and accusations against Pacifica. Even when the real causes of the problems were demonstrated, he refused to acknowledge responsibility, ignored the problems, and failed to respond for months at a time. All of that added unnecessary delay to the resolution of significant problems and delayed the Project as a whole.

17.     When construction did not progress at the pace BJ's desired, BJ's attempted to further intimidate Pacifica by filing a meritless lawsuit in the Court of Common Pleas of Cumberland County, Pennsylvania, in which BJ's unsuccessfully sought a preliminary injunction ordering Pacifica to turn the sitework project over to BJ's under a so-called self-help provision in the Lease. Netreba verified the Complaint and testified at the multiple days of hearings, obviously without firsthand knowledge. Consequently, the Cumberland County Court **never awarded** any of the relief BJ's requested.

18.     Now that BJ's has opened its warehouse club, the Cumberland County lawsuit is moot. Yet BJ's has taken no steps to discontinue it, using it instead as part of a plan to avoid paying rent and extort rent concessions from Pacifica.

19.     Despite the substantial completion of the Project, the successful and timely opening of its store, and knowing that it was the cause of the delays on the Project, BJ's recently sent a letter to Pacifica demanding a rebate of rent and threatening to sue for more than $4 million. BJ's claim is based entirely on Pacifica's alleged failure to satisfy certain dates that BJ's claims are required by a construction schedule found in the Lease.

4

20.     As explained in more detail below, BJ's entire $4+ million claim is based on the false premise that there exists an enforceable Project schedule, when BJ's knows that no such schedule exists because **BJ's did not take the steps required by the Lease to create such a schedule**.

21.     As set forth in more detail below, not only is BJ's not entitled to any return of rent, but BJ's actions during the course of the project resulted in substantial delays and caused Pacifica to incur millions of dollars of damages, which Pacifica is now entitled to recover.

## The Lease and BJ's Failure to Enforce the Critical Requirement of Establishing a Project Schedule

22.     Effective October 14, 2022, Pacifica and BJ's entered into a written lease for a portion of the Property.

23.     Effective March 6, 2024, Pacifica and BJ's entered into a written First Amendment to Lease (the "First Amendment"). The October 14, 2022 lease and the March 6, 2024 First Amendment are collectively referred to throughout this Complaint as the "Lease." Because the Lease contains confidential business information and because BJ's is in possession of the Lease, a copy is not attached to this Complaint.

24.     Lease § 1.2 defines the portion of the Property to be leased by BJ's from Pacifica (the "Premises") as follows:

> The Lot, including the Building to be constructed by [BJ's] on the Lot as provided in this Lease, containing approximately 99,804 square feet of Floor Area subject to a deviation of no more than 5% and those areas upon which the Fueling Facility and the Propane Tank Refill Station are to be located.

25.     Pursuant to Lease § 2.2, the "Lot" is defined as follows:

> "Lot" means the parcel(s) of land or condominium unit on which the Building, Propane Tank Refill Station and Fueling Facility, parking area and drive aisles are

5

to be constructed as indicated on the Site Plan attached hereto as <u>Schedule 1.8</u> and more particularly described in <u>Schedule 2.2A</u>.

26.    Lease § 1.15 contains certain "Key Dates," including the following:

Building Pad Turnover Penalty Date – originally 9/1/23, extended to 7/1/24

Outside Building Pad Turnover Date – originally 12/15/23, extended to 6/3/24

27.    Lease § 4.1(e) defines the "Building Pad" as follows:

The "<u>Building Pad</u>" means the area surrounding the Building and upon which the Building will be constructed, as shown on the Site Plan. This area shall include the Building foundation, sidewalks, any other concrete flatwork attached to the Building (such as the concrete truck and compactor pads) plus an additional ten feet (10') around such areas.

28.    Pacifica's work was separated into two phases denominated as "Phase I Site Work" and "Phase II Site Work."

29.    Lease § 4.2(a) defines "Phase II Site Work" as follows:

"<u>Phase II Site Work</u>" means all remaining site work to be undertaken by [Pacifica] in accordance with the requirements in <u>Schedule 4.1C</u>, which shall include construction of the Common Areas, completion of all access improvements from the Main Street(s) to the Common Areas servicing the Premises and any off-site work required by the Approvals.

30.    Lease § 4.1(h) defines "Phase I Site Work" and identifies the method by which the Project schedule was to be created, as follows:

"<u>Phase I Site Work</u>" means all site and Building Pad preparation work required to construct the Building and utilize the Club Staging Area, as set forth in <u>Schedule 4.1C</u>. . . . Once [Pacifica] commences the Phase I Site Work, the construction timetable attached hereto as <u>Schedule 4.1B</u> will be revised by [Pacifica] and [BJ's] to insert the appropriate dates keyed off of the commencement of the Phase I Site Work.

31.    Thus, per Lease § 4.1(h), the Lease anticipated that when the Phase I Site Work was commenced, BJ's and Pacifica would negotiate the complete construction timetable using Schedule 4.1B as a template.

32.     BJ's did not attempt to take that necessary step, which was required in order for there to be Project schedule enforceable against Pacifica.

33.     Lease Schedule 4.1C identifies technical specifications for some of the work on the Project.

34.     Lease Schedule 4.1B, entitled "CONSTRUCTION TIMETABLE," consists of a list of general descriptions of construction activities to be performed by both BJ's and Pacifica and general timeframes for the performance of that work.

35.     Lease Schedule 4.1B **does not** identify **any** specific dates for the required completion of **any** of the activities included in it.

36.     Additionally, Lease Schedule 4.1B **does not** contain terms defined in the Lease such as "Site Work Completion Date" or "Utilities Date," which, as explained below, are terms upon which BJ's now bases its claims against Pacifica.

37.     Lease § 30.6 regarding "disputes" provides an express basis for the claims now asserted against BJ's in this Complaint. Lease § 30.6 provides, in part, as follows:

> If a dispute arises between the parties as to any work to be performed by either of them under the provisions of this Lease, the party against whom the obligation to perform the work is asserted may perform such work and pay the costs thereof "under protest", the performance of such work shall in no event be regarded as voluntary performance, and such party shall have the right to institute suit for recovery of the cost of the work.  If it is adjudged that there was no legal obligation on the part of the party to perform the work or any part thereof, the party shall be entitled to recover the cost of the work or so much thereof as the party was not legally required to perform under the terms of this Lease, plus interest thereon at the Lease Interest Rate from the date of payment to the date of refund.

38.     Lease § 30.13 entitles the prevailing party to recover its attorney fees and costs, as follows:

> Prevailing Party.  If any action at law is necessary to enforce or interpret the terms of this Lease and the amount in controversy or the value of the relief sought shall  exceed $25,000.00, the prevailing party shall be entitled to reasonable

attorneys' fees and costs of the proceeding in addition to any other relief to which it may be entitled. If any action in equity is necessary to enforce or interpret the terms of this Lease, the prevailing party shall be entitled to reasonable attorneys' fees and costs in addition to any other relief to which it may be entitled.

39.    Lease § 30.21 expressly allows the concurrent pursuit of both legal and equitable remedies for the breaches of representations, warranties, and agreements, as follows:

Representations of Landlord and Tenant. All representations, warranties and agreements of Landlord and Tenant in this Lease shall be deemed special, unique and extraordinary. Any breach of any representation, warranty or agreement by either party shall be deemed to cause the other party irreparable injury not properly compensable by damages in an action at law, such that the rights and remedies of the non-breaching party may be enforced both at law or in equity.

40.    Additional pertinent terms of the Lease are addressed below.

## BJ's Caused Massive Delays on the Project

### BJ's Repeated and Untimely Changes to its Building Design Got the Project Off to a Poor Start

41.    The development of the shopping center required several governmental approvals and coordination with, and approvals from, various utility providers, including without limitation the Pennsylvania Department of Transportation ("PennDOT"), the Pennsylvania Department of Environmental Protection, Hampden Township, the Hampden Township Sewer Authority, the Cumberland County Conservation District, PPL Electric Utilities, the Pennsylvania American Water Company, Verizon, and UGI.

42.    An early requirement was the creation of a Land Development Plan (the "LDP") by Pacifica as the shopping center developer and the approval of the LDP by Hampden Township.

43.    Until final LDP approval was obtained, only limited construction activities could be undertaken by either Pacifica or BJ's.

44.     The LDP process required several sub-permits and approvals, *e.g.*, a PennDOT Highway Occupancy Permit (the "HOP").

45.     Importantly, all sanitary sewer and stormwater system designs had to be engineered by Pacifica's engineers and approved by the Township (as well as by the local sewer authority) before LDP approval could be obtained.

46.     If, at any time, the sanitary sewer or stormwater systems designs were changed, or if there were any changes to other systems (*e.g.*, water, gas, or electric systems) that could impact the sanitary or stormwater systems, additional review and approvals would be required.

47.     Typically, on this Project Township reviews took approximately 30 days and every time a change was made, a new 30-day clock started to run.

48.     The design of the sanitary, stormwater, water, gas, and electric systems started with input from the designer of the building to be served by those systems, *i.e.*, BJ's.

49.     An early step in the site design process was the receipt from the building designer of what is known as a "tap plan." The tap plan was supposed to inform the site designers of where each of the relevant utility systems is to enter and exit the building, in both horizontal location and depth below grade. That information is necessary so the utility designer can accurately design the underground utility systems to connect with the building at the proper locations and operate properly.

50.     The correct horizontal and vertical measurements are especially critical to the design of the site sanitary sewer system which, for the most part, relies on gravity for proper operation. Any changes in the horizontal or vertical location of where a waste line exits the building could have a domino effect on the overall sanitary design and require a complete redesign of the entire wastewater system.

51.     In or about September 2021, BJ's submitted its preliminary building plan to Pacifica, followed by many changes, some of which involved changing the horizontal and/or vertical locations of various utility lines.

52.     After incorporating the BJ's changes, Pacifica received approval of a Preliminary LDP on or about June 29, 2023.

53.     The Preliminary LDP approval allowed Pacifica to start the Phase I Sitework on or about August 21, 2023, expecting to complete the Phase I Sitework and deliver the Building Pad to BJ's by the fall of 2023.

54.     However, BJ's continued to make many more changes to its plans, requiring additional submissions to the Township. Every time BJ's made a change, the final LDP approval process was stopped in its tracks for, on average, 30 days.

55.     By early 2024, BJ's was still making changes to its plans, sending them to Pacifica, and demanding their inclusion in the LDP.

56.     Pacifica notified BJs that BJ's constant changes to its building design had made it impossible for Pacifica to obtain LDP approval within a reasonable time and made it difficult, if not impossible, to complete the required sitework within the originally contemplated timeframe.

57.     That discussion led to (1) the cessation of incorporating any more BJ's changes into the LDP, and (2) the March 6, 2024 Lease First Amendment, which changed certain target dates.

58.     On or about April 19, 2024, Pacifica finally obtained approval for recording the Final LDP.

59.     During the approval process, Pacifica sent every set of revised plans to BJ's either before or contemporaneously with sending them to the Township, thereby putting BJ's on notice

of exactly what changes had been incorporated and what changes had not been incorporated into the LDP.

**BJ's Changed Sanitary Sewer Exit Locations Without Telling Pacifica, Which Necessitated a Complete Redesign of the Sanitary Sewer System After Installation Had Begun**

60.     Despite the discussions leading to the decision to stop making changes to the BJ's building plans, and despite the fact that certain changes were not incorporated into the LDP or approved by the Township, BJ's proceeded to design and construct its building as if those changes had been approved – all without notice to Pacifica.

61.     During a site visit on or about October 31, 2024, Pacifica's engineer discovered discrepancies between the locations of sanitary sewer and water lines exiting and entering the BJ's building and the locations shown on the plans that had been coordinated with BJ's and formed the basis for the Final LDP approval.

62.     The most significant discrepancy, and the discrepancy that ultimately required the redesign and reconstruction of a large portion of the wastewater system, was BJ's unilateral relocation of a grease trap lateral by approximately 16 feet along the building wall.

63.     BJ's had not previously requested to move that grease trap lateral in any of the many changes dating back to the beginning of the design process.

64.     The approximate 16-foot discrepancy required one of two things to happen: either (1) BJ's could move the grease trap lateral to the location shown on the plans (the simpler of the two options); or (2) Pacifica would have to redesign and reconstruct the wastewater system (the much more complex and time-consuming option).

65.     The restoration of the grease trap lateral to the location shown on the plans would not have required any additional Township review or approval, while the redesign of the sanitary

system would have triggered an extensive Township review and potential modification of the approved LDP.

66.     BJ's refused to move the grease trap lateral.

67.     During the redesign of the wastewater system, Pacifica's engineers discovered other elements of BJ's construction that varied from the approved plans and encountered problems with conflicts with other systems, including the stormwater system, the water system, and the electrical system, all of which required some level of redesign.

68.     As was the case with the original LDP approval process, each change to either the sanitary or stormwater system required the submission of the changes to the Township and waiting for Township approval, with each change adding about 30 days just in waiting for Township comments.

69.     Additionally conflicts with the stormwater system caused by the sanitary sewer system redesign required input from BJ's regarding the building rain leaders. BJ's refused to provide the necessary input for several months, further delaying the redesign and Township approval process.

70.     Township approval of the sanitary sewer and stormwater system redesign was not obtained until on or about March 27, 2025 – a five-month delay during which Pacifica was limited in the sitework it could accomplish.

**BJ's Caused the Delay in Obtaining the PennDOT Highway Occupancy Permit**

71.     Obtaining a PennDOT HOP was one of the requirements for obtaining the Final LDP approval from the Township.

72.    Pacifica began the PennDOT HOP approval process for the shopping center in 2020. But because of BJ's traffic flow demands, which persisted even after PennDOT rejected those demands, the HOP was not obtained until on or about August 28, 2024.

73.    The PennDOT permit process typically consists of three main steps: (1) a Transportation Impact Study Scoping; (2) the Transportation Impact Study itself; and (3) HOP design.

74.    Before PennDOT will consider a HOP application, certain Township approvals are required.

75.    Pacifica submitted an initial Transportation Impact Study Scoping to Hampden Township on or about August 22, 2022. For access to the BJ's store, at BJ's insistence the initial submission included what became known as the right-in/right-out design or "RI/RO."

76.    BJ's claimed that the ability to access the store by making a right turn off the Carlisle Pike when entering the Property and a right turn onto the Carlisle Pike when exiting the Property was critical to its operations (in particular, fuel truck flow in the vicinity of the fueling station).

77.    The RI/RO flow required additional analysis regarding signal timings and its impact on overall traffic flow in the area.

78.    Following Township approval of, and extensive discussions with PennDOT about, a RI/RO design, Pacifica made the PennDOT HOP Submission in or about August 2023, reflecting the RI/RO design. PennDOT responded that Pacifica could expect preliminary approval.

79.    However, on or about January 9, 2024, PennDOT revoked its prior tentative approval of the RI/RO design.

80.     Rather than accepting PennDOT's disapproval, BJ's directed Pacifica to challenge it.

81.     The challenge was unsuccessful and, finally, after a great deal of discussion, BJ's agreed to a right-out only ("ROO") access on or about March 18, 2024.

82.     However, BJ's agreement to stop challenging the PennDOT RI/RO refusal was contingent upon Pacifica redesigning the site to ensure that fuel trucks could circulate to BJ's satisfaction with ROO movement, including the addition of a new high-volume driveway receiving lane.

83.     The new design required resubmittal of the LDP to Hampden Township for further approval and its attendant delay.

84.     PennDOT approved the new ROO traffic plan on or about July 23, 2024, and issued the HOP on or about August 28, 2024.

85.     Pacifica notified BJ's, and BJ's acknowledged, that the time required to pursue the PennDOT and Township approvals had made it impossible for Pacifica to obtain bids from, or sign contracts with, sitework contractors and had delayed the completion of Pacifica's sitework.

**Meanwhile BJ's, Intending to Try to Takeover the Project, Intentionally Began Interfering With Pacifica's Work and Pacifica's Ability to Find Contractors Willing to Perform the Delayed Sitework**

86.     On or about August 14, 2024, Pacifica learned that BJ's had undertaken to install the secondary electrical duct bank that was, at the time, the subject of discussion about a potential change order transferring that work from Pacifica to BJ's.

87.     When Pacifica confronted BJ's Patrick Netreba, consistent with his treatment of Pacifica throughout the Project, and without even inquiring of BJ's site personnel, Netreba flatly denied that any such thing had occurred.

88.     However, when confronted with photographic proof, Netreba was forced to admit that BJ's had overstepped its authority and had, in fact, usurped Pacifica's work.

89.     In the course of improperly usurping Pacifica's work, BJ's had failed to overlay the proposed duct bank on Pacifica's existing utility plans or wait for confirmation that its proposed design would not interfere with the design of the water, sanitary sewer, and stormwater systems.

90.     Pacifica also learned that BJ's had also installed the feeders that power the fueling facility beneath the main building. That work also was not coordinated with the Pacifica utility plans and required additional design coordination.

91.     Around this same time, Pacifica was trying to restart the sitework that had been on hold during the delays and the approval process outlined above and was soliciting bids for the remaining Phase II work, which BJ's insisted had to be completed by winter.

92.     Bidders that Pacifica had contacted previously before all the delays occurred declined to submit bids and told Pacifica that the timeline was too aggressive and could not be met, in part because the asphalt batch plants would shut down in the fall.

93.     Pacifica expanded its contractor search and even considered self-performing the work, eventually entering into discussions with Kinsley Construction, a large regional sitework contractor. Kinsley Construction advised that completing the work by winter **might** be possible, but certain things had to fall in line, including the availability of labor.

94.     Pacifica reported the bidding status to BJ's, including the expectation of receiving a bid from Kinsley Construction.

95.     Shortly thereafter, Kinsley Construction unexpectedly notified Pacifica that it would not be submitting a bid to Pacifica.

96.    BJ's then informed Pacifica that BJ's had a group willing and able to finish the work within BJ's desired timeframe. The "group" turned out to be Kinsley Construction.

97.    BJ's said that Kinsley Construction had provided a bid to BJ's of approximately $10 million, which was approximately double the amount of a bid Pacifica had received from Mowery Construction and budgetary pricing Pacifica had received from Whiting-Turner Contracting Company in 2023 for a scope of work that was much larger than the scope of work bid by Kinsley Construction. Taking into account the differences between the two scopes of work, Pacifica estimates the Kinsley Construction bid was approximately three times what Mowery Construction had bid and Whiting Turner had budgeted for the same work.

98.    BJ's acknowledged over multiple meetings that the Kinsley Construction bid was high.

99.    Additionally, and surprisingly, the Kinsley Construction bid proposed a project schedule that went beyond the start of winter, which was past the artificial deadline BJ's had demanded of Pacifica.

100.    Nevertheless, rather than working with Pacifica to develop a reasonable schedule and find a contractor to perform the work at a reasonable price, BJ's filed the Cumberland County injunction action, attempting to use it and the inflated Kinsley Construction bid as leverage against Pacifica.

101.    Pacifica continued searching for a contractor to complete the Project using the less aggressive schedule used by Kinsley Construction that BJ's had acknowledged during the Cumberland County litigation would be satisfactory.

102.    Even with the less aggressive timeline, contractor after contractor refused to bid because of the ongoing litigation and the "word on the street" that the Project had problems and was "doomed."

103.    Pacifica had substantive negotiations with three contractors, ultimately signing a contract with H&K Group, Inc., for over $3 million less than the Kinsley Construction bid, but higher than necessary because of BJ's interference and demanding a shorter-than-required construction timeline.

104.    Pacifica ultimately signed the H&K Group contract. However, by signing that contract Pacifica did not agree that it would be responsible for the increased cost or that it was waiving any claim against BJ's for that cost. *See* Lease § 30.17, which provides, in part, as follows:

> Failure of either party to complain of any act or omission by the other party, no matter how long the same may continue, shall not be deemed to be a waiver by the party of any of its rights hereunder.

105.    H&K Group completed the work sufficient for BJ's to open its warehouse club by on or about August 1, 2025, which was 31 days before BJ's deadline for closing its Camp Hill store (according to BJ's Netreba's testimony in the Cumberland County case).

**Pacifica's Damages**

106.    Because of the problems and delays BJ's created on the Project and BJ's interference with Pacifica's work, Pacifica has suffered and continues to suffer damages in excess of $75,000, including without limitation the following categories and unliquidated estimates of losses:

(a)    Design costs (currently approximately $165,000)

(b)    Change Orders (currently estimated to be in excess of $150,000)

(c)    Inflated contractor bids (currently estimated to be in excess of $1.5

million)

(d)    Overhead and general conditions (currently approximately $105,000)

(e)    Other delay damages, *e.g.*, late rent, financing, etc. (currently estimated to

be in excess of $2 million)

**COUNT I**

**Breach of Contract**

107.    Pacifica incorporates by reference paragraphs 1 through 106, above.

108.    To establish a breach of contract claim in Pennsylvania, a plaintiff must prove the

following four essential elements:

(a)    The existence of a valid contract;

(b)    Performance by the plaintiff;

(c)    A material breach of the contract by the defendant; and

(d)    Damages resulting from the breach.

109.    There is no dispute that the Lease is a valid contract entered into by Pacifica and

BJ's that is supported by adequate consideration.

110.    Pacifica has performed, and continues to perform, all material obligations under

the Lease, even though thwarted by BJ's, and has satisfied all conditions precedent to full

performance by BJ's.

111.    As outlined above, BJ's conduct constitutes breaches of the Lease, including

without limitation BJ's duty of good faith and fair dealing. To summarize, BJ's repeatedly

erected roadblocks in the path of Pacifica's work on the Project, whether intentionally or

accidentally. Then, rather than work with Pacifica in good faith to resolve issues, as is the

acceptable standard and practice in the construction industry, BJ's instead chose to take unreasonable positions not supported by any objective facts or reasonable interpretations of the Lease. BJ's caused extensive delays that resulted in Pacifica being unable to complete its work within the timeframe originally contemplated when the Lease was signed. In fact, BJ's delays and unreasonable demands made it impossible to even develop a reasonable and realistic schedule for the work. The delays resulted in the damages outlined above.

112.    Even if the Lease imposed any hard dates on Pacifica, which it did not, Pacifica is entitled to an extension of those dates because of the delays created by BJ's.

113.    As a result of the above-described impacts, inefficiencies, and delays, Pacifica is entitled to additional money above and beyond the sums that it is owed for rent under the Lease.

114.    While the full extent of Pacifica's damages are still being calculated, based on the delay and inefficiency damages and the BJ's imposed acceleration, all resulting from BJ's material breaches of the Lease, Pacifica has sustained damages well in excess of the $75,000 required for federal court jurisdiction.

115.    In addition to the damages referenced in the preceding paragraphs, Pacifica is entitled to interest, attorney fees, and costs under the terms of the Lease.

WHEREFORE, Pacifica requests the Court to enter judgment in its favor and against BJ's in an amount in excess of $75,000, plus interest, attorney fees, costs, and all other relief to which Pacifica may be entitled.

## COUNT II

### Declaratory Judgment

116.    Pacifica incorporates by reference paragraphs 1 through 115, above.

**Now That the Project is Substantially Complete, BJ's is Reversing Its Previous Legal and Factual Positions to Concoct Claims Against Pacifica**

117.    Recently, BJ's threatened Pacifica with a claim for a rent abatement in the aggregate minimum amount of $4,194,971.70 because: (1) Pacifica allegedly did not satisfy the requirements for satisfaction of the Utilities Date by the date allegedly required in the Lease; and (2) Pacifica allegedly did not satisfied the requirements for satisfaction of the Site Work Completion Date by the date allegedly required by the Lease. *See* BJ's counsel's July 31, 2025 letter, a true and correct copy of which is attached to this Complaint as Exhibit 1.

118.    The basis of the claim is BJ's misapplication of express Lease provisions and/or the creation of new procedures and requirements that do not exist anywhere in the Lease.

119.    First, BJ's wrongly asserts that the Lease contains express dates, known as the "Utilities Date" and the "Site Work Completion Date" by which Pacifica was supposed to complete all utilities work and all sitework, respectively. BJ's then claims that Pacifica did not meet those dates and, accordingly, is subject to certain penalties. *See id*.

120.    The major flaw in BJ's argument is that although the Lease contains provisions for the establishment of the Utilities Date and the Site Work Completion Date, BJ's did not follow those procedures, and, consequently, those dates were not established – at least for the purpose of assessing penalties against Pacifica.

121.    BJ's now attempts to circumvent the express procedure for establishing the "Utilities Date" and the "Site Work Completion Date" required by the Lease through a novel process **not found anywhere in the Lease**, *i.e.*, by calculating them based on the actual Building Pad Turnover Date. *See id*.

20

122.    Even more remarkably, the process BJ's now endorses necessarily requires BJ's to abandon and ignore previous factual and legal positions BJ's expressly took – including positions BJ's expressly took in the failed Cumberland County injunction action.

**The Lease Does Not Identify a Utilities Date or a Site Work Completion Date That Can Be Enforced Against Pacifica**

123.    The "Utilities Date" is defined in Lease § 4.2(c), as follows:

The "Utilities Date" shall mean the date upon which: (i) all water, electricity and gas lines are available to the Premises in the locations required by this Lease, and are capable of being energized and satisfy the capacity requirements of Schedule 4.1C, and (ii) sewerage disposal facilities and drainage facilities shall be available to the Premises in the locations required by this Lease, and satisfy the capacity requirements set forth in Schedule 4.1C.

124.    The "Site Work Completion Date" is defined in Lease § 4.2(b), as follows:

The "Site Work Completion Date" shall mean the date upon which all Phase I Site Work and Phase II Site Work is complete in accordance with the requirements of Schedule 4.1B, as evidenced by a certificate reasonably satisfactory to [BJ's] from [Pacifica's] project engineer that all of the Phase I Site Work and Phase II Site Work is complete in compliance with the requirements of Schedule 4.1C hereof.

125.    The penalty for the failure to timely achieve the Utilities Date is set forth in Lease § 4.2(d)(ii), as follows:

(ii) if the Utilities Date does not occur by the Utilities Date established in Schedule 4.1B, then no Minimum Rent shall be payable for the period beginning on the Rent Commencement Date and continuing for twice the number of days between the Utilities Date and the actual Utilities Date.

126.    The penalty for the failure to timely achieve the Site Work Completion Date is set forth in Lease § 4.2(d)(iii), as follows:

(iii) if the Site Work Completion Date shall not occur by the Site Work Completion Date established in Schedule 4.1B, then no Minimum Rent shall be payable for the period beginning on the Rent Commencement Date and continuing for twice the number of days between the number of days between the Site Work Completion Date and the actual Site Work Completion Date.

127.    Per the express language in Lease §§ 4.2(d)(ii) and 4.2(d)(iii), a precursor to claims by BJ's for a Utilities Date penalty or a Site Work Completion Date penalty is that those dates are "established in Schedule 4.1B."

128.    Lease Schedule 4.1B, entitled "CONSTRUCTION TIMETABLE," consists of a list of general descriptions of construction activities to be performed by both BJ's and Pacifica.

129.    The term "Utilities Date" does not appear anywhere in Lease Schedule 4.1B.

130.    The Term "Site Work Completion Date" does not appear anywhere in Lease Schedule 4.1B.

131.    Moreover, Lease Schedule 4.1B does not identify any dates for the completion of any of the work described in the general descriptions of construction activities.

132.    The reason no dates appear in Schedule 4.1B is that the Lease contemplated that the parties would negotiate and complete a Project schedule at the time the Phase I Site Work was commenced. In that regard, Lease § 4.1(h) provides in part as follows (emphasis added):

> Once [Pacifica] commences the Phase I Site Work, the construction timetable attached hereto as Schedule 4.1B **will be revised** by [Pacifica] and [BJ's] to insert the appropriate dates keyed off of the commencement of the Phase I Site Work.

133.    BJ's never attempted to enforce Lease § 4.1(h) to start the process to revise the Construction Timetable in Lease Schedule 4.1B.

134.    Even if BJ's had started that process, Pacifica would not have agreed to the general durations reflected in the unrevised Schedule 4.1B because of the delays experienced leading up to the start of Phase I Construction, as outlined above.

135.    Consequently, the "Construction Timetable" was never created as required by Lease § 4.1(h) and there was never any official schedule for BJ's to enforce for the purpose of calculating penalties. Therefore, BJ's does not have a valid claim for any penalties.

**Recognizing That a Utilities Date and a Site Work Completion Date Do Not Exist Under the Actual Terms of the Lease, BJ's Attempted to Create the Dates Out of Whole Cloth and Necessarily Abandoned Previously Taken Factual and Legal Positions**

136.    BJ's claim now relies upon a calculation to establish the Utilities Date and the Site Work Completion Date based on what BJ's claims is the actual Building Pad Turnover Date. *See* Exhibit 1 to this Complaint.

137.    However, the Lease allows those dates to be established one way, and one way only. It does not sanction the use of historical data, like the Building Pad Turnover Date, as a way of establishing those dates.

138.    But even if the Lease allowed the use of the Building Pad Turnover Date, BJ's claim still fails because it relies upon facts and theories that differ from judicial admissions BJ's made in the failed Cumberland County injunction case.

139.    There is no dispute that Pacifica physically allowed BJ's to start the construction of its building on the Building Pad on or before the June 3, 2024 Outside Building Pad Turnover Date required by Lease § 1.15.

140.    BJ's now claims that occurred on May 6, 2024, and then tries to claim that the mere physical turning over of the Building Pad constitutes satisfaction of the Building Pad Turnover Date.

141.    However, until July 31, 2025, BJ's consistently and repeatedly took the opposite position and claimed that the physical turning over of the Building Pad did not, in and of itself, constitute the establishment of the Building Pad Turnover Date. The gist of BJ's position was that the Lease contained certain other "conditions precedent" to the establishment of the actual Building Pad Turnover Date and that Pacifica had not satisfied those conditions.

142.    As examples, in its failed Cumberland County injunction action, BJ's expressly claimed that Pacifica had not fulfilled certain outstanding conditions as of June 12, 2024, specifically citing issues with the electrical transformer, the natural gas connection, power line conflicts with the underground storage tanks, and the absence of certain claimed Pacifica certifications, among other things. *See* BJ's Injunction Complaint, Exh. 4, a true and correct copy of which is attached to this Complaint as Exhibit 2.

143.    BJ's continued to assert Pacifica's failure to satisfy all conditions precedent to the satisfaction of the Building Pad Turnover Date in an August 29, 2024 Default Notice, specifically citing the absence of final HOP approval, defects in the delivery of the fueling facility pad, the absence of certain required professional certifications, and the absence of a fire protection line, among other things. *See* BJ's Injunction Complaint, Exh. 5, a true and correct copy of which is attached to this Complaint as Exhibit 3.

144.    On or about September 26, 2024, BJ's acknowledged through its New Jersey counsel, and later admitted in the Cumberland County injunction case, that "the Building Pad had been turned over although [Pacifica] had not yet completed all of the **preconditions**" to the establishment of the Building Pad Turnover Date, and that BJ's started construction of its building "notwithstanding [Pacifica's] failure to complete a number of the **preconditions** to the Building Pad Turnover Date enumerated in Lease Section 4.1(1)." *See* BJ's Injunction Complaint, Exh. 8, a true and correct copy of which is attached to this Complaint as Exhibit 4 (emphasis added).

145.    At the time it took the foregoing factual and legal positions, BJ's was trying to make the case for assessing against Pacifica a Building Pad Late Penalty under Lease § 4.2(d)(i).

146.     Lease § 4.2(d)(i) provides as follows:

If Landlord fails to satisfy certain dates (subject to extension for Force Majeure as set forth in Section 30.3, and subject to extension for delays caused by Tenant, its contractors, employees, agents, or assigns for which Landlord shall be entitled to a day-for-day extension for such delays), Tenant shall suffer significant damages which are not currently capable of being ascertained.  Accordingly, the parties have agreed that the damages set forth below for failure to satisfy certain dates shall serve as liquidated reimbursement (and not as a penalty) for all of the damages that Tenant will suffer as a result of Landlord's delay.  Specifically:

(i) if the actual Building Pad Turnover Date does not occur by the Building Pad Turnover Penalty Date, then Landlord shall pay to Tenant the amount of Four Thousand Four Hundred Thirty-Three and 00/100 Dollars ($4,433.00) per day (the "Building Pad Late Penalty") for each day beyond the Building Pad Turnover Penalty Date until the actual Building Pad Turnover Date with the Building Pad Late Penalty capped at a maximum amount of Three Hundred Fifty Thousand and 00/100 Dollars ($350,000.00). The Building Pad Late Penalty shall be payable by Landlord to Tenant at the same time as the payment of the first installment of the Building Allowance following the Stage 1 Completion Date.

147.     Lease § 30.29(a), regarding the Building Allowance and Stage 1 Completion Date, provides as follows:

"Building Allowance" means the sum set forth in Section 1.16 to be paid to Tenant by Landlord as consideration for construction of the Building. "Stage 1 Completion Date" shall mean the date upon which the Building shell is complete, namely, that the roof of the Building is on and weathertight, and the Building is "dried in".

148.     However, BJ's later abandoned pursuing a Building Pad Late Penalty, presumably because Pacifica had completed the construction of the Building Pad before the July 1, 2024 Building Pad Turnover Penalty Date, and, in any event, the penalty was capped at $350,000 and BJ's had larger penalties in mind. BJ's waived the collection of the Building Pad Late Penalty by not claiming it before requesting payment of the first installment of the Building Allowance following the Stage I Completion Date. *See* Lease § 4.2(d)(i).

149.    The foregoing admissions, which now constitute judicial admissions by virtue of incorporation into BJ's Cumberland County Complaint, render BJ's claim for the asserted late satisfaction of the Utilities Date and the Site Work Completion Date invalid.

150.    BJ's should be bound by its previous admissions and not be allowed to abandon them in favor of contrary and inconsistent positions.

**Any Utilities Date or Site Work Completion Date is Subject to Extension Because of the Delays Caused by BJ's**

151.    BJ's threatened claim for Utility Date and Site Work Completion Date penalties fails for the additional reason that BJ's caused delays on the Project and actively interfered with Pacifica's ability to complete its work in an efficient manner, as set forth above.

152.    Lease § 4.2(d) provides that the Site Work Completion Date, the Utilities Date, and other relevant dates are "subject to extension for Force Majeure . . . and subject to extension for delays caused by [BJ's], its contractors, employees, agents, or assigns for which [Pacifica] shall be entitled to a day-for-day extension for such delays."

153.    A party is not entitled to liquidated damages for the amount of delay caused by its own actions, by unforeseen conditions, or by other circumstances for which the alleged breaching party is not responsible.

**Lease §§ 4.2(d)(ii) and 4.2(d)(iii) Do Not Meet the Standards for Liquidated Damages and Constitute Unreasonable and Unenforceable Penalties Under Pennsylvania Law**

154.    A contract clause providing for "liquidated" damages – irrespective of the name ascribed – is void and unenforceable if it is, in fact, a "penalty."

155.    Liquidated damages may only be awarded where the harm that is caused by the breach is incapable or very difficult of accurate estimation and the amount fixed is a reasonable

forecast of just compensation for the harm that is caused by the breach. It must be a reasonable pre-estimate of probable actual damages that is determined at the time the parties enter into the contract. Failure to perform a reasonable forecast of estimated actual damages at the time the parties enter into the contract renders the liquidated damages provision unenforceable.

156.    Upon information and belief, prior to Lease execution BJ's made no legitimate attempt to accurately estimate actual damages in the event of delays in achieving the Utility Date or the Site Work Completion Date, or to show that withholding two days' rent for each day of delay was a reasonable forecast of the actual damages BJ's could expect to suffer in the event of any such delays.

157.    In contrast, a penalty is fixed as a punishment, or threat of punishment, designed to prevent a breach. Liquidated damages clauses are unenforceable penalties if they are disproportionate to the value of the performance promised or the injury that has actually occurred, as is the case here.

158.    Even if liquidated damages may be awarded, a party enforcing a liquidated damages clause is not entitled to double recovery.

159.    Here, the fact that BJ's claims the Utility Date and Site Work Completion Date "liquidated" amounts may be assessed concurrently, *i.e.*, each can be assessed for the same period of delay, conclusively shows they are not intended to compensate BJ's for a loss, but rather are intended to punish Pacifica. Thus, they are unenforceable penalties.

### Standards for Declaratory Relief

160.    Under 28 USC § 2201, a declaratory judgment is appropriate where the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties

having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

161.    The history between the parties as outlined above, culminating most recently with BJ's counsel's July 31, 2025 letter, shows there is an actual case or controversy that is ripe for disposition. *See* Exhibit 1 to this Complaint.

162.    Accordingly, for the foregoing reasons, Pacifica is entitled to an order declaring that BJ's may not withhold rent based on its assertion that Pacifica failed to achieve either the Utilities Date or the Site Work Completion Date.

WHEREFORE, Pacifica respectfully requests the Court to enter a Judgment declaring that Pacifica is entitled to collect the full amount of rent required by the Lease without any setoff related to the satisfaction of the Utilities Date or the Site Work Completion Date, and awarding Pacifica all other relief to which it is entitled, including without limitation interest, attorney fees, and costs.

Respectfully Submitted,

**SAXTON & STUMP**

*/s/ Matthew Chabal, III*
Christopher C. Conner, Esquire
Attorney I.D. No. 36407
cconner@saxtonstump.com
Matthew Chabal, III, Esquire
Attorney I.D. No. 49926
mc@saxtonstump.com
Jason T. Confair, Esquire
Attorney I.D. No. 206729
jconfair@saxtonstump.com
4250 Crums Mill Road, Suite 201
Harrisburg, PA  17112
(717) 941-1213
*Attorneys for Plaintiff*
*Pacifica Mechanicsburg LLC*