## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| PACIFICA MECHANICSBURG LLC, | : | |
| | : | |
| | : | CIVIL ACTION |
| Plaintiff, | : | |
| | : | NO. 1:25-cv-01663 |
| v. | : | |
| | : | |
| BJ'S WHOLESALE CLUB, INC., | : | |
| | : | |
| Defendant. | : | |

## DEFENDANT'S ANSWER, DEFENSES AND COUNTERCLAIM TO PLAINTIFF'S AMENDED COMPLAINT

Defendant BJ's Wholesale Club, Inc., by its attorneys Eckert Seamans Cherin & Mellot, LLC, submits its Answer, Defenses, and Counterclaim to Plaintiff's Amended Complaint, as follows:

### ANSWER TO "PARTIES"

1.     Defendant admits that Plaintiff is a Pennsylvania limited liability company.  Defendant is without sufficient information to admit or deny that all members of Plaintiff are citizens of California.

2.     Admitted, except denied with respect to Defendant's mailing address.

### ANSWER TO "JURISDICTION AND VENUE"

3.     Admitted.

124595510.1

4.      Admitted that venue is appropriate in this district under 28 U.S.C.

§ 1391.  Other allegations are neither admitted nor denied.

## ANSWER TO "FACTUAL BACKGROUND"

5.      Admitted that Plaintiff holds legal title to the described real property.

Defendant is without sufficient information to admit or deny allegations with

respect to the ownership of Plaintiff.

6.      Admitted.

7.      Admitted.

8.      Admitted.

9.      Admitted.

10.     Denied, except that the terms of the Lease speak for themselves.

11.     Denied, except admitted that difficulties arose with respect to the

opening of Defendant's facility

12.     Denied.

13.     Denied.

14.     Denied.

15.     Denied.

16.     Denied, except admitted that Patrick Netreba was Defendant's

primary contact with Plaintiff with respect to the construction of Defendant's

facility.

17.    Denied, except that admitted that BJ's filed in the Court of Common Pleas of Pennsylvania an action captioned <u>BJ's Wholesale Club, Inc. v. Pacifica Mechanicsburg LLC</u>, Docket No. 2024-10866.

18.    Denied.

19.    Denied, except admitted that on July 31, 2025, Defendant sent a letter to Plaintiff demanding certain abatements of rent as provided in the Lease.  The contents of the letter speak for themselves.

20.    Denied.

21.    Denied.

## The Lease

22.    Admitted.

23.    Denied, except that the execution of the First Amendment to the Lease is admitted.

24.    Denied, except the actual language of Lease § 1.2 is admitted.

25.    Denied, except the actual quoted language of Lease § 2.2 is admitted.

26.    Denied, except that it is admitted that the Building Pad Turnover Penalty Date was initially stated as September 1, 2023 in the original Lease and was extended to July 1, 2024 in the First Amendment, and that the Outside Building Pad Turnover Date was initially stated as December 15, 2023 in the original Lease and was extended to June 3, 2024 in the First Amendment.

27.    Denied, except that the actual language of Lease § 4.1(e) is admitted.

28.    Denied, except admitted that the Lease refers to Pacifica's obligation to perform and complete Phase I Site Work and Phase II Site Work.

29.    Denied, except that the actual quoted language of Lease § 4.2(a) is admitted.

30.    Denied, except that the actual language of Lease § 4.1(h) speaks for itself.  Plaintiff's characterization of the quoted language is denied.

31.    Denied.

32.    Denied.

33.    Denied, except that the actual provisions of Lease Schedule 4.1C are admitted.  Plaintiff's characterization of the document is denied.

34.    Denied, except that Defendant admits that Lease Schedule 4.1B contains a timetable for the performance of Plaintiff's Phase II Site Work.

35.    Denied.

36.    Denied.

37.    Denied, except that the actual language of Lease § 30.6 is admitted. Plaintiff's characterization of the document is denied.

38.    Denied, except that the actual language of Lease § 30.13 is admitted. Plaintiff's characterization of the document is denied.

39.    Denied, except that the actual language of Lease § 30.21 is admitted. Plaintiff's characterization of the document is denied.

40.    Defendant neither admits nor denies the allegations of this paragraph.

**<u>Delays in the Initiation of the Project</u>**

41.    Admitted.

42.    Defendant admits that Plaintiff was required to obtain approval of a Land Development Plan from Hampden Township.

43.    Denied.

44.    Admitted.

45.    Denied, except that Defendant admits that Plaintiff was responsible to obtain approval of Hampden Township for the design of sanitary and stormwater sewers.

46.    Denied.

47.    Denied.

48.    Denied, except that Defendant admits that it provided timely input to Plaintiff with respect to the design of sanitary and stormwater sewers for its premises.

49.    Denied, except that Defendant admits that it provided Plaintiff with timely data about the entry point of sanitary and stormwater sewer systems.

50.    Denied, except that Defendant admits that the outflow of the sanitary sewer system depended in part on gravity.

51.    Admitted.

52.    Admitted.

53.    Denied, except that Defendant admits that Plaintiff could have commenced Phase I Site Work on or before August 21, 2023.

54.    Denied.

55.    Denied.

56.    Denied.

57.    Denied, except that Defendant admits that the First Amendment was adopted as of March 6, 2024, and modified scheduled dates as set forth therein.

58.    Admitted.

59.    Denied.

## Modification of Sanitary Sewer Locations

60.    Denied.

61.    Denied.

62.    Denied.

63.    Denied.

64.    Denied.

65.    Denied.

66.     Denied.

67.     Denied.

68.     Denied.

69.     Denied.

70.     Denied, except that Defendant admits that Pacifica did not obtain Hampden Township approval of modifications to the sanitary and storm sewer systems until March 27, 2025.

### The PennDOT Highway Permit

71.     Admitted.

72.     Denied.

73.     Admitted.

74.     Defendant is without sufficient information to admit or deny the allegations of this paragraph.

75.     Admitted.

76.     Admitted

77.     Admitted.

78.     Denied, except that Defendant admits that Pacifica submitted a HOP design to PennDOT in or about August 2023.

79.     Denied, except that Defendant admits that PennDOT ultimately refused to approve the HOP design that Pacifica had submitted.

80.    Admitted.

81.    Denied, except that Defendant admits that the challenge to PennDOT's ruling was unsuccessful.

82.    Denied, except that Defendant admits that the design of the site was modified to facilitate necessary access by fuel trucks.

83.    Denied, except that Defendant admits that Pacifica submitted the modified design to Hampden Township for approval.

84.    Admitted.

85.    Denied.

### Pacifica Fails to Engage a Contractor

86.    Denied.

87.    Denied.

88.    Denied.

89.    Denied.

90.    Denied.

91.    Denied.

92.    Denied.

93.    Denied.

94.    Denied.

95.    Denied.

96.    Denied.

97.    Denied.

98.    Denied.

99.    Denied.

100.    Denied.

101.    Denied.

102.    Denied.

103.    Denied, except that Defendant admits that in November 2024 Plaintiff ultimately signed contracts with H&K Construction Group for completion of Phase II Site Work.

104.    Denied, except that the actual language of Lease § 30.17 is admitted.

105.    Denied, except that Defendant admits that it opened its facility to the public on or about September 1, 2025.

## Damages

106.    The allegations of all subparagraphs of this paragraph are denied.

## ANSWER TO
## "COUNT I – BREACH OF CONTRACT"

107.    Defendant repeats and realleges the allegations of paragraphs 1 through 106.

108.    Defendant neither admits nor denies the conclusions of law stated in this paragraph.

109.    Defendant admits that the Lease is a valid contract supported by adequate consideration.

110.    Denied.

111.    Denied.

112.    Denied.

113.    Denied.

114.    Denied, except that Defendant admits that the amount in controversy in this action exceeds $75,000 exclusive of interest and costs.

115.    Denied.

## ANSWER TO
## "COUNT II – DECLARATORY JUDGMENT"

116.    Defendant repeats and realleges the allegations of paragraphs 1 through 115.

117.    Denied, except that Defendant served Plaintiff with a demand for the abatement rent as set forth in Exhibit 1 to the Amended Complaint.  The contents of that document speaks for itself.

118.    Denied.

119.    Denied.

120.    Denied.

121.    Denied.

122.    Denied.

123.    Denied, except that the quoted language of Lease § 4.2(c) speaks for itself.

124.    Denied, except that the quoted language of Lease § 4.2(b) speaks for itself.

125.    Denied, except that he quoted language of Lease § 4.2(d)(ii) speaks for itself.

126.    Denied, except that he quoted language of Lease § 4.2(d)(iii) speaks for itself.

127.    Plaintiff's characterization of Lease §§ 4.2(d)(ii) and 4.2(d)(iii) is denied.

128.    Plaintiff's characterization of Schedule 4.1(B) is denied.  The document speaks for itself.

129.    Denied.

130.    Denied.

131.    Denied.

132.    Denied, except that the actual language of Lease § 4.1(h) is admitted.

133.    Denied.

134.  Denied.

135.  Denied.

136.  Denied.

137.  Denied.

138.  Denied.

139.  Denied, except admitted that Plaintiff permitted Defendant to commence construction of its facility before June 3, 2024.

140.  Denied.

141.  Denied.

142.  Denied, except that the provisions of Exhibit 2 to the Amended Complaint speak for themselves.

143.  Denied, except that the provisions of Exhibit 3 of the Amended Complaint speak for themselves.

144.  Denied, except that the provisions of Exhibit 4 of the Amended Complaint speak for themselves.

145.  Denied.

146.  Denied, except the actual language of Lease § 4.2(d)(i) is admitted.  .

147.  Denied, except the actual language of Lease § 30.29 is admitted.

148.  Denied.

149.  Denied.

150.   Denied.

151.   Denied.

152.   Denied, except that the quoted language of Lease § 4.2(d) speaks for itself.

153.   Defendant neither admits nor denies the conclusion of law stated in this paragraph.

154.   Denied.  Defendant neither admits nor denies the conclusion of law stated in this paragraph.

155.   Denied.  Defendant neither admits nor denies the conclusion of law stated in this paragraph.

156.   Denied.

157.   Denied.  Defendant neither admits nor denies the conclusion of law stated in this paragraph.

158.   Defendant neither admits nor denies the conclusion of law stated in this paragraph.

159.   Denied.

160.   Defendant neither admits nor denies the conclusion of law stated in this paragraph.

161.   Admitted.

162.   Denied.

## AFFIRMATIVE DEFENSES

### <u>FIRST AFFIRMATIVE DEFENSE – FAILURE TO STATE A CLAIM</u>

The Complaint fails to state a claim on which relief may be granted.

### <u>SECOND AFFIRMATIVE DEFENSE – FAILURE TO PERFORM</u>

Pacifica is not entitled to damages because it breached the Lease by failing to perform its obligations under the Lease to complete Landlord's Construction Responsibilities in accord with BJ's Design Criteria Manual, Lease Schedule 4.1C, in accord with the Construction Timetable, Lease Schedule 4.1B.

### <u>THIRD AFFIRMATIVE DEFENSE – BREACH OF IMPLIED COVENANT OF GOOD FATH</u>

Pacifica breached the implied covenant of good faith and fair dealing in the Lease by reason, among other things, of its attempt to defer the commencement of Phase II Site Work until a time Pacifica considered financially favorable and its attempt to demand additional financial compensation from BJ's for adherence to the Construction Timetable.

### <u>FOURTH AFFIRMATIVE DEFENSE – CONTRACTUAL ASSUMPTION OF RISK</u>

Pacifica contractually agreed to complete the Phase II Site Work in accord with the specifications of BJ's Design Criteria Manual, Lease, Schedule 4.1C, within the time specified by the Construction Timetable, Lease Schedule 4.1B, in

accord with the First Amendment to the Lease, without regard to any financial risk or expense to Pacifica.

### FIFTH AFFIRMATIVE DEFENSE – MODIFICATION

The First Amendment to the Lease constitutes an agreed modification with respect to the deadlines provided in Article 4 of the Lease and the Construction Timetable.

### SIXTH AFFIRMATIVE DEFENSE – WAIVER

The First Amendment to the Lease waives any claim by Pacifica with respect to alleged delays incurred prior to its effective date of March 6, 2024.

### SEVENTH AFFIRMATIVE DEFENSE – ESTOPPEL

Pacifica is estopped to contend that the Building Pad Turnover Date did not occur on May 6, 2024.

### EIGHTH AFFIRMATIVE DEFENSE – LIMITATION OF LIABILITY

Pursuant to Lease § 30.4, BJ's is not liable for any consequential, special, punitive or indirect damages allegedly incurred by Pacifica.

### NINTH AFFIRMATIVE DEFENSE – WAIVER

Pacifica expressly consented to and waived any objection to BJ's negotiating with prospective prime contractors for the performance of Phase II Site Work.

## TENTH AFFIRMATIVE DEFENSE – CONTRACTUAL AUTHORIZATION

Lease § 27.3(d) authorized BJ's to negotiate with prospective contractors in order for BJ's to exercise its contractual self-help right to perform Phase II Site Work that Pacifica had failed to perform after the Building Pad Turnover Date.

## ELEVENTH AFFIRMATIVE DEFENSE – WAIVER OF PROOF OF ACTUAL DAMAGES

By Lease § 4.2(d), Pacifica waived any claim that the liquidated damages provided by Lease §§ 4.2(d)(ii) and 4.2(d)(iii) and do not constitute damages incurred by BJ's by reason of Pacifica's failure to perform timely in accord with the Construction Timetable or to require that BJ's prove actual damages incurred by reason of delay.

## TWELFTH AFFIRMATIVE DEFENSE – LACK OF CAUSATION

Any delays in Pacifica's performance of Landlord's Construction Responsibilities allegedly caused by BJ's are not on the critical path and did not cause Pacifica to fail to meet the deadlines required by the Construction Timetable and by Lease § 4.2(d).

## COUNTERCLAIM

Defendant-Counterclaimant BJ's Wholesale Club, Inc., through its counsel Eckert Seamans Cherin & Mellot, LLC, alleges the following counterclaim:

1.      This case arises from the repeated failure of Landlord Pacifica Mechanicsburg LLC ("Pacifica") to meet the construction deadlines established in the Lease between Pacifica and Tenant BJ's Wholesale Club, Inc. ("BJ's") for the construction of a BJ's wholesale club on the site of a shopping center being developed by Pacifica.

2.      As a result of Pacifica's failure, BJ's is entitled to more than $4,000,000 of liquidated damages, in the form of abatement of Minimum Rent otherwise payable under the Lease.

3.      As set forth in more detail below, the Lease required Pacifica to prepare the site of a BJ's store and adjoining fueling facility for construction by BJ's in accord with the design set out in BJ's Design Criteria Manual ("DCM"), incorporated as an integral part of the Lease, within the deadline set out in the Construction Timetable incorporated as an integral part of the Lease.  Failure by Pacifica to meet certain deadlines specified in the Lease entitles BJ's to liquidated damages in the form of abatement of Minimum Rent.  As also set forth in more detail below, Pacifica failed to meet those deadlines.

4.      Pacifica's failure to meet the deadlines specified in the Lease was primarily caused by Pacifica's inability or deliberate refusal to engage a contractor to complete the second phase of its construction responsibilities, including the installation of utility lines, until Pacifica was compelled to do so to avoid the

issuance of an injunction by the Pennsylvania Court of Common Pleas in an action
brought by BJ's.  Although the timetable for the second phase of the work began to
run at the beginning of May 2024, Pacifica did not engage a contractor until early
November 2024, and that contractor did not commence work until the beginning of
December 2024.  As a result, Pacifica lost seven idle months in the completion of
its construction responsibilities.

5.      Pacifica's failure also resulted from Pacifica's persistent inability or
refusal to plan the installation of utility lines in accord with the requirements of the
Design Criteria Manual despite repeated instruction from BJ's, resulting in delay in
obtaining regulatory approval from the local authorities.

6.      Instead of promptly commencing work on the second phase of its
construction responsibilities, Pacifica falsely claimed that it had no duty to do so
because of its own failure to meet certain administrative deadlines in the Lease that
existed for BJ's benefit and were not related to construction.

7.      Pacifica demanded modification of the construction deadlines in the
Lease to which it was not entitled.  In its Complaint in this action, Pacifica has
admitted that it made this demand in order to postpone construction to a time of
year when Pacifica believed it would be less costly to perform its construction
responsibilities.

8.     Pacifica also demanded increases in rent and a $4,000,000 cash payment by BJ's as the price for performing its construction responsibilities within the deadlines provided by the Lease.

9.     As a result of Pacifica's unjustified delays in engaging a contractor and commencing work, it missed construction deadlines in the Lease that entitle BJ's to receive as liquidated damages two days' Minimum Rent for each day of delay beyond the deadline.  Pacifica has rejected BJ's demand that it recognize and consent to these abatements of Minimum Rent.

10.    BJ's therefore demands a declaratory judgment that it is entitled to the abatement of Minimum Rent as liquidated damages in the amount to be determined by the Court, as well as judgment for the refund of Minimum Rent paid to Pacifica under protest, together with attorneys' fees and costs as provided in the Lease.

## PARTIES, JURISDICTION AND VENUE

11.    Defendant-Counterclaim Plaintiff BJ's Wholesale Club, Inc. is a corporation incorporated under the law of Delaware with its principal place of business in Marlborough, Massachusetts.

12.    Plaintiff-Counterclaim Defendant Pacifica Mechanicsburg LLC is a limited liability company established under the law of Pennsylvania, with its principal place of business in San Diego, California.  On information and belief, none of the members of Pacifica is a citizen of Massachusetts or Delaware.

13.     The matter in controversy in this case exceeds $75,000 exclusive of interest and costs.

14.     Jurisdiction over the Complaint is based on 28 U.S.C. § 1332(a)(1).

15.     Jurisdiction over this Counterclaim is based on 28 U.S.C. § 1332(a)(1) and 28 U.S.C. § 1367.

16.     Venue lies in the Middle District of Pennsylvania under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the matter arose in this district.

## BACKGROUND

17.     BJ's operates what are known as wholesale clubs in 22 states including Pennsylvania. The wholesale club business model offers customers who purchase renewable annual membership subscriptions favorable prices on goods and motor fuel. A typical BJ's wholesale club will be sited in a shopping center with good highway access and will include both a large merchandise sales store and a fueling station. The fueling station is an integral part of the business model because it attracts customers who then use the occasion to shop for merchandise.

18.     BJ's is subject to competition in the wholesale club market by several large-scale competitors, including Sam's Club and Costco. Because membership requires payment of an annual fee, it is typical that wholesale club customers will maintain a membership in only one competing wholesale club at a time.

19.    The Harrisburg Metropolitan Area is divided by the Susquehanna River.  It contains distinct sub-markets on either side of the river, known as the East Shore and the West Shore.  Residents of one of these sub-markets ordinarily shop within that sub-market.

20.    In 2021-22, BJ's operated a wholesale club in the West Shore sub-market located in Camp Hill, PA.  The lease on the Camp Hill facility was due to expire on August 31, 2025, unless BJ's gave notice by February 2025 that it was exercising its option to renew the Camp Hill lease.

21.    BJ's determined that the Camp Hill facility no longer served its needs.  After examining alternative sites in the West Shore sub-market, BJ's concluded that the best alternative would be the new shopping center to be developed in Mechanicsburg, PA by Pacifica, known as the Beltway Towne Centre ("Center").

## THE ORIGINAL LEASE

22.    On March 14, 2022, BJ's and Pacifica entered a Lease for space within the Center for a wholesale club ("the Lease").  BJ's would be the anchor tenant of the Center.  The wholesale club would include an approximately 99,000 square foot merchandise store ("the Building") and an adjacent Fueling Facility (collectively "the Premises").

23.    The Lease has an initial term of 20 years plus options to renew.  Lease § 1.4 provides for a Minimum Rent of $1,596,864 per year, increasing to

$1,929,211 at the end of the initial term, as well as Additional Rent that includes BJ's share of real estate taxes and common area maintenance charges.

24.     As set forth in more detail below, the Lease provided that Pacifica would obtain the necessary state and local regulatory approvals, prepare the building site for BJ's to construct the Building and Fueling Facility, and construct the necessary utility access, highway access, paving, and other site improvements for the club.

25.     The Lease incorporates a Project Work Letter, Schedule 4.1C4, that delineates the respective responsibilities of Pacifica and BJ's.  In particular, the Project Work Letter requires Pacifica to complete all On-Site and Off-Site Work, as defined in the Lease, including the completion of all utility and storm drain connections to within five feet of the Building and the Fueling Facility.

26.     The Lease divides Landlord's Construction Responsibilities into two parts, Phase I Site Work and Phase II Site Work.  They are phased in this way such that once the Landlord receives the requisite approvals and permits, the Phase I Site Work is completed, and the Building Pad is delivered to the Tenant, the Tenant can then start work to construct the Building.  This structure requires that the Phase II Site Work is completed concurrently with the Tenant's work to construct the Building and Fueling Facility in accord with the deadlines set out in the Lease.

27.    Lease § 4.1(h) defines Phase I Site Work as follows:

Phase I Site Work means all site and Building Pad preparation work required to construct the Building and utilize the Club Staging Area, as set forth in Schedule 4.1C.

28.    Lease § 4.2(d) defines Phase II Site Work as follows:

Phase II Site Work means all remaining site work to be undertaken by [Pacifica] in accordance with the requirements in Schedule 4.1C, which shall include construction of the Common Areas, completion of all access improvements from the Main Street(s) to the Common Areas servicing the Premises, and any off-site work required by the Approvals.

29.    Schedule 4.1C1 of the Lease incorporates BJ's Design Criteria Manual, Version 2021.0.  The Design Criteria Manual defines the specifications of Pacifica's responsibilities in the performance of Phase I and Phase II Site Work. Its introductory paragraph states in pertinent part:

This document is part of Schedule 4.1C – Landlord's Construction Responsibilities. It must be read with and understood in the context of the Lease and other Lease schedules.

Accordingly, Pacifica agreed in the Lease to perform its Phase I and Phase II Site Work in compliance with the requirements set by BJ's in the Design Criteria Manual.

30.    Schedule 1.8 of the Lease includes a Site Plan that includes, among other provisions, all "access improvements, curb cuts, median cuts and traffic

controls" relating to highway access.  Lease § 25.1(c) requires that "as of the Rent

Commencement Date . . . there will be free and uninterrupted access as shown on

the Site Plan for motor vehicles between the Main Street and the Common Areas."

31.    The Design Criteria Manual, ¶ I.A.c.1, provides, in pertinent part:

> The Prototype Site Plan attached to (and part of) this
> document represents an actual site that graphically show
> BJ's minimum requirements for the site related
> components (the "Site Work") including parking layout;
> vehicular access; building and Fueling Facility placement;
> utilities, grading and drainage; paving; site lighting; etc.

32.    Accordingly, the Lease requires Pacifica to perform its Site Work

responsibilities in accord with the requirements of the Design Criteria Manual and

the Site Plan to the extent that the necessary state and local regulatory Approvals

can be obtained.

33.    Lease § 30.8 provides:

> Wherever it is provided in this Lease that an act is to be
> undertaken by any person, such act shall be done by such
> person at its sole cost and expense unless a contrary intent
> is expressed.

Pacifica therefor agreed to complete the Phase I and Phase II Site Work as the

Lease required at its sole cost and expense and assumed the financial risk of doing

so.

34.    Lease § 4.2(a) in pertinent part defines Approvals as "all discretionary

consents approvals and permits" necessary to the issuance of Building Permits for

the Building and the Fueling Facility, other than the actual building permits and

those "necessary for access from the Main Street(s) to the Shopping Center in

accordance with the requirements of this Lease."  Lease § 4.2(c) requires Pacifica

to use "reasonable efforts" to obtain all approvals by the Outside Approvals Date.

Lease § 1.15 initially fixed the Outside Approvals Date at August 1, 2023.

35.     Schedule 4.1B of the Lease contains a Construction Timetable that

commences with Pacifica's certification to BJ's that the Phase I Site Work is

complete and the Building Pad is available for construction.  The Construction

Timetable runs from the Building Pad Certification to Tenant at Week 1 through

the Rent Commencement Date at Week 43.

36.     Lease § 4.1(h) states as follows with respect to the Construction

Timetable:

> Once Landlord commences the Phase I Site Work, the
> construction timetable attached hereto as Schedule 4.1B
> will be revised by [Pacifica] and [BJ's] to insert the
> appropriate dates keyed off the commencement of Phase I
> Site Work.

37.     As set forth below, the parties complied with this language when they

agreed in the First Amendment to the Lease to reset the key dates while Phase I

Site Work was in process.  The First Amendment was effective March 6, 2024, and

Pacifica represented to BJ's that Phase I Site Work was complete on April 23,

2024.

38.     Lease § 4.2(d) provides for three forms of liquidated damages if

Pacifica misses specified deadlines, subject to force majeure and delays caused by

BJ's:

> (i)     A "Building Pad Late Penalty" capped at $350,000 if the Building Pad is not turned over to BJ's by the Building Pad Turnover Penalty Date.

> (ii)    An abatement of two days' Minimum Rent for each day that the actual Utilities Date is later than the Utilities Date specified in Schedule 4.1B. Section 4.2 (c) defines the Utilities Date as the date that all water, electricity, gas and sewer are available to the Premises at the location  required by the Lease.

> (iii)   An abatement of two days' Minimum Rent for each day that the actual Site Work Completion Date is later than the Site Work Completion Date specified in Schedule 4.1B.  Section 4.2(b) defines the Site Work Completion Date as the date on which all Phase I and Phase II Site Work is complete in accord with Schedule 4.1B in compliance with Schedule 4.1C.

## THE FIRST AMENDMENT TO THE LEASE

39.     The original Lease required Pacifica to have obtained all necessary

Approvals by the Outside Approvals Date of August 1, 2023.  One of the key

approvals was the Land Development Plan ("LDP"), which required approval by

Hampden Township ("Township").

40.     Approval of the LDP required Pacifica to submit to the Township for

approval the design of the sanitary sewer and storm sewer systems.

41.     The Lease required that the location of all utility systems on the

Premises, including sanitary and storm sewer systems, be determined in accord

with the requirements of Section 4.1C.

42.     BJ's submitted the design requirements for sanitary and storm sewer connections to Pacifica after reviewing proposed drawing prepared by Pacifica's engineer.  However, Pacifica repeatedly ignored comments and corrections on its proposed sewer plans submitted by BJ's.  As a result, BJ's had to repeatedly demand that Pacifica revise its sanitary and storm sewer plans to comply with the requirements of BJ's design of the Premises.

43.     Each revision of the sewer plans had to be submitted to the Township for approval, with the accompanying administrative delay.  The cumulative effect of these repeated revisions required by Pacifica's disregard of BJ's comments delayed Township approval of the Final LDP until on or about April 19, 2024.

44.     In addition, to the LDP, one of the necessary Approvals was a Highway Occupancy Permit ("HOP") issued by the Pennsylvania Department of Transportation ("PennDOT").  The Schedule 1.8 Site Plan incorporated in the Lease required that access from the Center to the adjoining highway permit a right turn entering the center and a right turn leaving the center ("RI/RO").  As further alleged in paragraphs 93 to 100 below, PennDOT initially gave tentative approval of an HOP incorporating RI/RO and then reversed its position after a change of personnel.

45.     Thus, Pacifica had not obtained necessary Approvals by the August 1, 2023, Outside Approvals Date specified in the Lease.

27

46.    Lease § 4.2(iv) gave both BJ's and Pacifica the option to terminate the Lease if the deadline of the Outside Approvals Date was not met.

47.    BJ's learned in approximately December 2022 that its competitor, Costco, intended to construct a new warehouse club in the West Shore market area. BJ's had informed Pacifica of this fact in or about January 2023.

48.    Even though Pacifica had missed the Outside Approvals Date, BJ's considered it essential to keep the project progressing and avoid termination of the Lease in order to have an up-to-date facility in the West Shore market. Accordingly, BJ's suggested on or about September 11, 2023, that the Lease be amended to reset certain key dates from which the Construction Timetable was triggered.  During the ensuing negotiations, Pacifica was aware of BJ's need to meet Costco's competition.

49.    BJ's and Pacifica executed the First Amendment to the Lease ("First Amendment") dated March 6, 2024.

50.    The preamble to the First Amendment recites that Pacifica has not obtained the Approvals by the original August 1, 2023, Outside Approvals Date, and that Pacifica has not turned over the Building Pad by the original Building Pad Turnover Penalty Date of September 1, 2023.

51.     The First Amendment § 3 resets the Outside Building Pad Turnover Date to June 3, 2024 and provides that Pacifica is required to comply with all of the Building Pad Turnover Requirements enumerated in Lease § 4.1(l).

52.     This section also resets the Building Pad Turnover Penalty Date to July 1,2024, after which the Building Pad Late Penalty in Lease § 4.2(d)(i) would commence to run.

53.     First Amendment § 3 resets the Outside Approvals Date to June 3, 2024.

54.     First Amendment § 4 carves out the approval of the HOP by PennDOT and provides that BJ's will agree to accept the Building Pad "with the sole remaining requirement of [Pacifica] to obtain the HOP Approval."  If Pacifica does not obtain HOP Approval by June 28, 2024, the First Amendment gives BJ's the options to pursue the HOP Approval at Pacifica's expense as an exercise of self-help pursuant to Lease § 27.3(d).

55.     First Amendment § 6 confirms all other terms of the Lease except as modified by the First Amendment.

56.     The intention of the parties to the First Amendment was to establish new starting points for the Key Dates provided by original Lease § 1.15 and to excuse Pacifica's failures to meet those deadlines in order to move the Project

forward from that point.  The relation of the Construction Timetable to the

amended Key Dates remains as it was in the original Lease.

### PACIFICA REFUSES TO PERFORM PHASE II SITE WORK

57.     The Construction Timetable provides that the zero date for its timeline

is:

>        Building Pad Turnover Date – Landlord completes
>        temporary utilities and access to the staging area(s), the
>        Building GC's Trailer and Building Pad.

58.     Pacifica obtained approval of the Final LDP on or about April 19,

2024.

59.     Pacifica completed Phase I Site Work, including the installation of

temporary utilities, and turned the Building Pad over to BJ's on April 23, 2024.  It

confirmed the turnover and the completion of Phase I Site Work by letter dated

May 31, 2024.  (Counterclaim Exhibit 1).  The letter concludes:

>        As indicated, Landlord is providing this notice as to the
>        intention to satisfy the Building Pad Turnover
>        Requirements, with it being anticipated that all of the
>        remaining Building Pad Turnover Requirements shall be
>        completed on or around the Outside Building Pad
>        Turnover Date of June 3, 2024, as required by the First
>        Amendment, and no later than July 1, 2024, being the
>        Building Pad Turnover Pad Penalty Date as set forth in the
>        First Amendment.

60.     The turnover of the Building Pad allowed BJ's to begin construction

of the Building.  In reliance on Pacifica's representation that Phase I Site Work

was complete, BJ's commenced construction of the Building on or about May 6, 2024.

61.    BJ's notified Pacifica that construction had commenced.  Pacifica also had actual notice of that fact through its on-site personnel.

62.    By October 15, 2024, BJ's had completed construction of the Building to the point where it was weather tight.  BJ's was unable to proceed further because Pacifica had not completed certain elements of Phase II Site Work, including the installation of electrical, gas, water and sewer utilities and fire protection water supply.

63.    Beginning in March 2023, and then repeatedly through July 2024, BJ's provided Pacifica's engineer with drawings and other data that showed the actual locations of the Building's grease trap in accord with the plumbing plans for the Building and the DCM, and the resulting elevations required for connection to the sanitary sewer lines.  Pacifica took no action in response to these repeated notifications.  Pacifica's engineer did not visit the site of the building until October 2024, at which point he purports to have observed the inconsistency of the grease trap location with the existing sanitary sewer plans.

64.    In August 2024, BJ's learned that the elements of Phase II Site Work needed for further progress were not being completed because Pacifica had not begun Phase II Site Work or even engaged a contractor for that purpose.

65.    In August and September 2024, principals of BJ's, including Senior Vice President for Real Estate David Picot and Director of Real Estate Patrick Netreba conferred by telephone and Zoom with Pacifica representatives, including Pacifica's principal Akhil Israni, in an effort to get Phase II Site Work started.  On August 21, 2024, they were informed by Israni that Pacifica had not engaged a general contractor for either on-site or off-site construction work.  In that conversation, Israni said that Pacifica had been unable to procure a general contractor and requested BJ's assistance in finding one.

66.    On August 29, 2024, with Pacifica's knowledge and consent, BJ's engaged Kinsley Construction, Inc. ("Kinsley"), a local general contractor, to prepare a bid package for the Phase II Site Work and off-site work.  BJ's notified Pacifica on August 30 that Kinsley would be visiting the site, and Pacifica replied on September 3 that it "would be glad to meet with Kinsley."

67.    By letter dated August 29, 2024 (Counterclaim Exhibit 2), BJ's gave notice to Pacifica of certain defaults, including the fact that Pacifica had not completed five administrative conditions that Lease § 4.1(l) required it to complete in connection with the turnover of the Building Pad to BJ's, and that Pacifica had not provided the connection with the fire prevention line within the 12-week deadline set by the Construction Timetable.

68.     Pacifica responded by letter dated September 10, 2024 (Counterclaim Exhibit 3), which stated that the Construction Timetable had not begun to run because the Building Pad Turnover Date had not occurred:

> All of the time periods for Landlord's Construction Responsibilities are measured from the Building Pad Turnover Date (measured as week 0 on Schedule 4.1B of the Lease). As noted above and in other written correspondence, Pacifica asserted that the Building Pad Turnover Date has not occurred. Until the Building Pad Turnover Date Occurs, the date for the Fire Protection Line is not established and Landlord is not obligated to commence or complete the elements of Landlord's Construction Responsibilities outlined in Schedule 4.1B.

This assertion demonstrates that Pacifica was well aware of the Building Pad Turnover Date as the triggering event for the Construction Timetable. It also contradicts Pacifica's representation in its May 31, 2024, letter that Pacifica intended to complete all remaining Building Pad Turnover Requirements by June 3, 2024, the Outside Building Pad Turnover Date.

69.     All of the Building Pad Turnover Requirements in Lease § 4.1(l) remaining incomplete involved documentation for the benefit of BJ's and did not affect the physical or legal ability of BJ's to construct the Building. Moreover, all of the Building Pad Turnover Requirements remaining incomplete, except for the issuance of the HOP, were within Pacifica's sole power to complete. On

information and belief, Pacifica refused to complete these requirements because it had determined, for reasons of self-interest, not to commence Phase II Site Work.

70.     On September 13, 2024, BJ's received from Kinsley a bid package of approximately $9,900,000 to complete the Phase II Site Work, including on and off-site work  On the same day, BJ's transmitted the Kinsley bid package to Pacifica.  In a Zoom meeting between BJ's and Pacifica later that day, Picot and Netreba conferred with Israni about the Kinsley bid.  Israni demanded an additional $4,000,000 payment from BJ's and an additional increase of Minimum Rent by $4.25 per square foot, more than 25%, or Pacifica would not consent to the Kinsley bid.  In those discussions, Pacifica reiterated its claim that the Construction Timetable in Schedule 4.1B had not been triggered because Pacifica had not fulfilled a portion of the Building Pad Turnover Requirements in Lease § 4.1(l).  In addition to demanding new payments from BJ's, Pacifica also requested that BJ's renegotiate the deadlines in the Construction Timetable.

### THE COMMON PLEAS COURT ACTION COMPELS PACIFICA TO BEGIN PHASE II SITE WORK

71.     Lease § 27.3(d) provided BJ's with a right of self-help to complete Phase II Site Work if Pacifica defaulted.  It provides in pertinent part:

> If Landlord defaults at any time in the timely completion of Landlord's work under Schedules 4.1B and 4.1C and Landlord does not commence to cure the default within ten (10) days  after  notice  thereof  by  Tenant  and  thereafter

diligently pursue the same to completion, then Tenant shall have the right but not the obligation to:

(i) perform, at Landlord's sole cost and expense, all or any part of Landlord's work.  If and to the extent that Tenant exercises its rights hereunder, Landlord agrees to cooperate in good faith and provide Tenant with reasonable assistance so that Tenant can complete such portions of Landlord's work.  Landlord grants to Tenant the right, as its agent, to directly contact and contract with Landlord's contractors, on behalf of Landlord, to complete the work at Landlord's cost and expense.  Landlord covenants, upon Tenant's request, to provide Tenant with duplicate sets of all plans, specifications and contracts prepared in connection with construction of the Building and Common Areas, as well as schedules of all contractors, subcontractors, and suppliers. . . .

(ii) seek injunctive relief, specific performance or other equitable remedies against Landlord to require Landlord to perform its obligations under the Lease . . .

72.    By letter dated September 22, 2024 (Counterclaim Exhibit 4) Pacifica stated that it had in hand a sixteen-month-old bid from a general contractor, RS Mowery, to perform the Phase II Site work for $5,200,000 but did not state whether that bid was still active.  Pacifica had not previously informed BJ's of the Mowery bid during its previous requests for help to obtain a contractor.  The letter also "rejects any effort by Tenant to perform the work itself."

73.    BJ's responded by letter dated September 26, 2024 (Counterclaim Exhibit 5).  This letter inquires whether the RS Mowery bid is still in effect, and it demands, if the bid is still valid, that Pacifica commence the remaining Landlord's

Construction Responsibilities immediately.  It states that BJ's regards the Building Pad Turnover Date as having occurred on May 6, 2024, when BJ's took possession of the Building Pad and commenced construction with Pacifica's knowledge and consent, but in any event no later than the Outside Building Pad Turnover Date of June 3, 2024.  It demands that Pacifica immediately commence construction of Phase II Site Work to satisfy the milestones in the Schedule 4.1B Construction Timetable, and it reserves all of BJ's rights and remedies under the Lease, including but not limited to self-help under Section 27.3(d).

74.    Pacifica responded by letter dated October 4, 2024 (Counterclaim Exhibit 6).  Pacifica's response reiterates Pacifica's position that the Building Pad Turnover Date would not occur and trigger the Construction Timetable until Pacifica completes the remaining Building Pad Turnover Requirements, all of which were completely within Pacifica's control.  In substance, Pacifica was asserting the power to delay indefinitely the trigger of the Construction Timetable. The response is silent with respect to the RS Mowery bid.  Instead, it concedes that Pacifica has not yet retained a contractor to perform the Phase II Site Work and falsely accuses BJ's of having interfered with its ability to do so by unspecified actions.  Pacifica again demands renegotiation of the Construction Timetable.

75.    In response to Pacifica's intransigent, bad faith refusal to commence Phase II Site Work, BJ's brought suit in the Court of Common Pleas for

Cumberland County on October 16, 2024, for a declaratory judgment that Pacifica was in default under the Lease and that BJ's has the right to enter the Premises and perform self-help under Lease § 27.3(d), together with a preliminary injunction restraining Pacifica from interfering with BJ's right to self-help. A copy of the Verified Complaint in <u>BJ's Wholesale Club, Inc. v. Pacifica Mechanicsburg LLC</u>, Civil Action No. 2024-10866 ("State Court Action"), is attached as Counterclaim Exhibit 7.

76.    At the hearing on the motion for a preliminary injunction on October 22, 2024, Akhil Israni admitted in open court that Pacifica had not engaged a contractor to perform Phase II Site Work. At that point, the judge summoned the parties to a conference in chambers, at which he stated that he would grant the requested preliminary injunction unless the parties were able to resolve the dispute by Pacifica immediately engaging a contractor to perform Phase II Site Work. To provide time for settlement negotiations, the judge adjourned the case to November 1, 2024.

77.    The parties were not able to reach agreement. However, the prospect of a preliminary injunction implementing BJ's right of self-help finally caused Pacifica to bestir itself. On the evening of November 7, 2024, Pacifica informed BJ's that it had entered two contracts with prime contractor H&K Group, Inc. to complete the on-site and off-site components of Phase II Site Work, including

highway access, with a scheduled commencement date of December 3, 2024, and a scheduled completion date of May 15, 2025. At the hearing of November 8, 2024, the court directed the parties to submit post-hearing briefs on the issue whether the H&K Contracts satisfied Pacifica's obligations under the Lease.

78.    On November 18, 2024, the court issued an order (Counterclaim Exhibit 8) that denied the motion for a preliminary injunction without prejudice but retained jurisdiction to "schedule another hearing if Defendant's contractor falls substantially behind in the work."

79.    Through the State Court action, BJ's forced Pacifica to abandon its position that the Construction Timetable had not started to run, engage a contractor, and move forward with the performance of Phase II Site Work under the prospect of continuing judicial scrutiny.

80.    Pacifica's chosen contractor did not commence work until on or about December 3, 2024, more than seven months after Pacifica had announced the completion of Phase I Site Work in April 2024 and BJ's had commenced construction of the Building on May 6, 2024.

81.    The State Court Action did not resolve the question of what date the Construction Timetable began to run.

## PACIFICA FAILS TO MEET THE CONSTRUCTION
## TIMETABLE DEADLINES

82.    Pacifica's contractor did not begin work on Phase II Site work until on or about December 3, 2024.

## SEWER INSTALLATION

83.    The Construction Timetable required that "permanent power, gas, water and sewer are fully installed and operational" within 24 weeks of the Building Pad Turnover Date.  This refers to the Utilities Date defined in Lease § 4.1(c)(ii), which requires that "sewerage disposal facilities and drainage facilities shall be available to the Premises in the locations required by this Lease and satisfy the capacity requirements set forth in Schedule 4.1C."

84.    Twenty-four weeks after the Building Pad Turnover Date of May 6, 2024, is October 21, 2024.  As of that date, Pacifica had not engaged a contractor or begun work on the sanitary sewer connections.

85.    The grease trap is an essential element of the sanitary sewer system within the Building.  Between March 2023 and July 2024, BJ's had repeatedly notified Pacifica of the planned-to-install location of the grease trap required by the DCM and the Building's plumbing plans.  This location would be approximately 16 feet from the location identified on Pacifica's LDP, which would require further modification of the LDP.  Pacifica took no action at this time.

86.    BJ's installed the piping from the Building to be connected to the grease trap at the location required by the Building's plumbing plans and the DCM.

87.    After Pacifica ignored BJ's earlier communications about the grease trap, in October 2024, Pacifica's engineer made a site visit at which its representative claimed to have realized, for the first time, that BJ's had installed the piping from the club to connect to the grease trap in a location that would require further modification of the LDP and a new application to the Township.  At this time, Pacifica had not engaged a contractor for the Phase II Site Work and therefore had not begun work on the sanitary sewer connections.  Nevertheless, Pacifica took no action to modify its plans in accord with the grease trap location or obtain regulatory approval of modified plans.

88.    Instead, Pacifica demanded that BJ's relocate the grease trap. Relocation would have required demolition and reconstruction of pipes and other infrastructure already installed beneath the completed concrete floor slab. Moreover, the Lease required Pacifica to design utility connections, including sewer connections, to connect with the Building as designed and constructed in accordance with the plans that had been provided to Pacifica.  BJ's rightfully insisted that Pacifica modify its sewer designs accordingly.

89.    Relocation of elements of the storm water drainage system was also required to comply with the Building as designed and constructed.  BJ's had provided Pacifica with timely information about the location of the drainage leaders.  Rather than comply with BJ's information, Pacifica demanded that BJ's modify the Building to fit Pacifica's existing utility plans.

90.    As a result of Pacifica's delay in modifying the sanitary and storm sewer plans as required to conform to BJ's design and construction of the Building, Pacifica did not obtain regulatory approval of the sanitary and storm sewer plans until approximately March 27, 2025.

91.    The actual Utilities Date did not occur until June 25, 2025, when Pacifica completed the final sewer connection.

## HIGHWAY ACCESS

92.    The Lease Site Plan attached to the Lease and Lease § 25.1(c) require that the highway access to the BJ's Building and Fueling Facility provide for what is known as "right in, right out"  ("RI/RO") access, which would permit free circulation of fuel trucks to the fueling facility and would allow an existing business and residential development direct highway access without having to traverse through the Shopping Center.  The RI/RO access is a standard element of shopping center design.  On information and belief, PennDOT had in the past repeatedly approved RI/RO access.

93.     As it was required to do by the Lease, Pacifica submitted the

necessary applications for RI/RO access to PennDOT in approximately August

2023.  At that time, PennDOT responded with tentative approval.

94.     However, in January 2024, PennDOT revoked its preliminary

approval of the RI/RO design.  On information and belief, this administrative

decision resulted from a change of the District Engineer at PennDOT.

95.     The alternative, "right out only" ("ROO") access, required relocation

of driveways on the Site Plan.  Before taking that step, BJ's and Pacifica jointly

attempted to persuade PennDOT to reconsider its decision and accept RI/RO

access.  Pacifica participated in this effort to comply with its obligation under

Lease § 4.1(c) to make "reasonable efforts" to obtain necessary approvals.

96.     When PennDOT declined to reconsider its decision, BJ's accepted the

need for ROO access in March 2024 and modified the Site Plan accordingly.  At

that point in time, Pacifica had not yet completed Phase I Site Work and the

Building Pad Turnover had not occurred.

97.     PennDOT approved the ROO access plan on approximately July 23,

2024, and issued the necessary HOP on approximately August 28, 2024.  At that

point in time, Pacifica had not engaged a contractor for any of the Phase II Site

Work.  Pacifica finally entered a contract with H&K to construct the necessary

highway access on or about November 7, 2024, in response to the State Court Action.

98.    In ordinary course, the lead procurement time required for the necessary traffic signal equipment takes approximately six months from the order date to delivery of equipment so that it can be installed in the public right-of-way. On information and belief, Pacifica did not make the necessary orders until after it entered the H&K contract.

99.    Temporary highway access sufficient for BJ's to obtain a Certificate of Occupancy and open the club was not completed by Pacifica until March 18, 2025.  The equipment for permanent signal installation was not delivered until after that date and was not installed as of August 2025.  Under Lease § 4.2(a), Phase II Site Work includes the completion of all access improvements from the Main Street(s) to the Center.

**COMPLETION OF PHASE II SITE WORK**

100.   BJ's received a permanent Certificate of Occupancy for the Building and Fueling Facility on August 26, 2025, and was therefore able to open the club to the public on September 1, 2025.  Other than the installation by Pacifica of permanent traffic signaling equipment and the completion of punch list items, Phase II Site Work was completed with the receipt of the permanent Certificate of Occupancy.

101.   Pacifica did not satisfy the Utilities Date in Lease § 4.2(d)(ii) for 247 days after the date required by the Construction Timetable.  Pacifica did not satisfy the Phase II Site Work Completion date until at least August 26, 2025, 290 days after the date required by the Construction Timetable, and more off-site work remains to be completed.

## COUNT I
### (Declaratory Judgment – Breach of Contract)

102.   BJ's repeats and realleges the allegations of the foregoing paragraphs 1 through 101 as though fully set forth herein.

103.   The Lease as modified by First Amendment constitutes a valid contract.

104.   As set forth above, Pacifica has failed to perform its obligations in that it failed to complete the installation of utilities by the Utilities Date required by the Construction Timetable and Lease § 4.2(d)(ii) and failed to complete all Phase II Site Work by the Site Work Completion Date as required by the Construction Timetable and Lease § 4.2(d)(iii).

105.   The Rent Commencement Date under Lease § 6 is August 1, 2025.

106.   Lease § 4.2(d) provides in pertinent part:

> If Landlord fails to satisfy certain dates (subject to extension for Force Majeure as set forth in Section 30.3 and subject to extension for delays caused by Tenant . . . for which Landlord shall be entitled to a day for day

extension for such delays, Tenant shall suffer significant damages which are not currently capable of being ascertained. Accordingly, the parties have agreed that the damage set forth below for failure to satisfy certain dates shall serve as liquidated reimbursement (and not as a penalty) for all of the damages that Tenant will suffer as a result of Landlord's delay.

107.   Lease § 4.2(d)(ii) then provides:

If the Utilities Date does not occur by the Utilities Date established in Schedule 4.1B, then no Minimum Rent shall be payable for the period beginning on the Rent Commencement Date and continuing for twice the number of days between the Utilities Date and the actual Utilities Date.

108.   The Utilities Date established in the Construction Timetable is October 21, 2024, 24 weeks after the Building Pad Turnover Date.  The actual Utilities Date is June 25, 2025, 247 days after the Utilities Date established in the Construction Timetable.

109.   Pursuant to Lease § 1.4, Minimum Rent is $1,596,864 per year or $4,374.97 per day.  Two days' Minimum Rent equals $8,749.94.

110.   Pursuant to Lease § 4.2(d)(ii), BJ's is entitled to an abatement of Minimum Rent in the amount of $2,161,235.11 based on 247 days of delay.

111.   Lease 4.2(d)(iii) provides:

If the Site Work Completion Date shall not occur by the Site Work Completion Date established in Schedule 4.1B, then no Minimum Rent shall be payable for the period beginning on the Rent Commencement Date and

continuing for twice the number of days between the Site Work Completion Date and the actual Site Work Completion Date.

112.   The Site Work Completion Date established in the Construction Timetable is December 9, 2024, 31 weeks after the Building Pad Turnover Date. The actual Site Work Completion Date was not reached until August 26, 2025, 260 days after the Site Work Completion Date established in the Construction Timetable.

113.   Pursuant to Lease § 4.2(d)(iii), BJ's is entitled to an abatement of Minimum Rent of $2,274,984.40, based on 260 days of delay.

114.   Lease § 4.2(d)(vi) provides that the abatements of Minimum Rent set forth in § 4.2(d) "shall be cumulative."  The cumulative total abatement of Minimum Rent due under Lease §§ 4.2(d)(ii) and 4.2(d)(iii) is $4,436,219.58.

115.   On July 31, 2025, BJ's served notice on Pacifica that it claimed an abatement of Minimum Rent in the amount of $2,161,235.11 under Lease §4.2(d)(ii) by reason of the late completion of the Utilities Date and a further abatement of at least $2,038,735.96 by reason of Pacifica's ongoing failure to have completed the Phase II Site Work as of July 30, 2025.  (Complaint Ex. 1).  The notice requested that Pacifica acknowledge that Minimum Rent has abated in the foregoing amounts.

116.    In the Complaint in this action, Pacifica has denied that it breached the Lease, that it has failed to meet the deadlines established by the Lease for the Utilities Date or the Site Work Completion Date, and that BJ's is entitled to any abatement of Minimum Rent under the Lease.  The Complaint demands declaratory judgment that BJ's is required to pay Minimum Rent in full without abatement.

117.    BJ's paid the August 1, 2025, installment of Minimum Rent under protest pursuant to Lease § 30.6 and continues to pay each monthly installment of Minimum Rent under protest.

118.    Lease § 30.6 provides for the refund of sums paid under protest at the Lease Interest Rate as defined in Lease § 6.2.

119.    By reason of BJ's demand for abatement of Minimum Rent as provided in Lease § 4.2(d) and Pacifica's denial that BJ's is entitled to any such abatement, a substantial actual controversy exists between the parties that requires declaratory relief pursuant to 28 U.S.C. § 2201.

WHEREFORE, Defendant-Counterclaimant BJ's Wholesale Club, Inc. demands judgment (i) declaring pursuant to 28 U.S.C. § 2201 that BJ's is entitled to abatement of Minimum Rent under the Lease in the amount to be determined by the Court and (ii) for all amounts of Minimum Rent paid by BJ's under protest up

to the foregoing amount, with interest at the Lease Interest Rate, (iii) for costs of suit, and (iv) for all other relief that the Court deems just and proper.

## COUNT II
### (Attorneys' Fees)

120.   BJ's repeats and realleges the allegations of the foregoing paragraphs 1 through 119 as though fully set forth herein.

121.   Lease § 30.13 allows the prevailing party in any dispute between BJ's and Pacifica arising under the Lease to recover its reasonable attorneys' fees in pertinent part as follows:

> If any action at law is necessary to enforce or interpret the terms of this Lease and the amount in controversy or the value of the relief sought shall exceed $25,000, the prevailing party shall be entitled to reasonable attorneys' fees and costs of the proceeding in addition to any other relief to which it may be entitled.

122.   The amount in controversy in this action exceeds $25,000.

WHEREFORE, Defendant-Counterclaimant BJ's Wholesale Club, Inc. demands judgment for its reasonable attorneys' fees as prevailing party in this action, in the amount to be determined by the Court, together with such other and further relief as the Court shall deem just and proper.

Respectfully submitted,

/s/ Adam M. Shienvold

Adam M. Shienvold, Esquire (PA ID 81941)
ECKERT SEAMANS CHERIN & MELLOTT, LLC
213 Market Street, 8th Floor
Harrisburg, PA  17101
Telephone:  717.237.6029
Facsimile:   717.237.6019
Email:   ashienvold@eckertseamans.com

James M. Hirschorn, Esquire
Mark S. Olinsky, Esquire
Gregory E. Reid, Esquire
SILLS CUMMIS & GROSS, P.C.
One Riverfront Plaza
Newark, NJ  07102
Telephone:  973.643.5288
Facsimile:   973.643.6500
jhirschhorn@sillscummis.com
molinsky@sillscummis.com
greid@sillscummis.com

Date:  December 9, 2025

*Counsel for Defendant, BJ's Wholesale Club, Inc.*

## **CERTIFICATE OF SERVICE**

I certify that on this 9th day of December, 2025, I delivered a copy of the

foregoing DEFENDANT'S ANSWER, DEFENSES AND COUNTERCLAIM TO

PLAINTIFF'S AMENDED COMPLAINT upon all counsel of record via this

Court's electronic filing system, which service satisfies the requirements of the

Federal Rules of Civil Procedure.

/s/ *Adam M. Shienvold*
Adam M. Shienvold, Esquire

*Counsel for Defendant, BJ's Wholesale
Club, Inc.*

124595510.1