**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **PACIFICA MECHANICSBURG LLC,**<br>**Plaintiff,** | : | **CIVIL ACTION** |
| **v.** | : | |
| **BJ's WHOLESALE CLUB, INC.,**<br>**Defendant.** | : | **NO.  25CV1663** |

<u>**MEMORANDUM OPINION**</u>

Pacifica Mechanicsburg LLC ("Pacifica") and BJ's Wholesale Club, Inc. (BJ's) entered into a lease agreement to develop and lease a BJ's wholesale club.  However, the construction fell behind the originally-contemplated timeline and after the development was completed and the store opened, Pacifica filed suit alleging that BJ's breached the contract by violating the duty of good faith and fair dealing, increasing the cost of the project.  BJ's responded by filing a counterclaim for breach of contract, seeking a declaratory judgment because, it alleges, Pacifica had failed to meet certain construction milestones and thus BJ's is entitled to liquidated damages and attorney's fees.  Pacifica has now filed, pursuant to Federal Rule of Civil Procedure 12(b)(6), a Motion to Dismiss BJ's counterclaims.  For the reasons that follow, the Motion will be denied.

**I.      FACTUAL BACKGROUND**

In March 2022, Pacifica and BJ's entered into a long-term lease arrangement in which the parties would jointly construct, and BJ's would operate, a wholesale club, gas station, and related facilities in a shopping center development in Mechanicsburg, Pennsylvania.  The lease outlined the obligations of each party in the construction and maintenance of the premises.  Pacifica, as landlord, was to obtain certain state and regulatory approvals and perform specified site work. BJ's was responsible for designing and constructing the warehouse itself.  Because there were interrelated systems spanning the ambit of each party—including stormwater drainage, plumbing

1

connections, and tractor trailer access for fuel and unloading—the project required coordinated efforts between Pacifica and BJ's, and the lease incorporated a Construction Timetable that detailed a timeline of tasks in weeks between BJ's taking possession of the building site and the store opening.

But before construction could even begin, the parties needed to obtain the necessary approvals from the state and county—a job assigned to Pacifica. The lease set a final deadline for Pacifica to complete this task, the "Outside Approvals Date." If Pacifica did not meet that August 1, 2023, deadline, BJ's had some self-help options to pursue the approvals at Pacifica's expense. But if BJ's chose not to exercise those options or if it was unsuccessful in its efforts, either party could walk away from the lease.

Within four weeks of obtaining the approvals—or the following March should that day fall in the late autumn or winter—the lease required Pacifica to begin "Phase I Site Work" to prepare the construction site for BJ's to start on the building. This included work such as grading and earthworks projects, building retaining walls, preparing compacted earth pads, and setting up temporary water, electricity, and stormwater drainage for the work site. When Pacifica began Phase I construction, the lease required Pacifica and BJ's to revise the construction timeline "to insert the appropriate dates keyed off of the commencement of the Phase I Site Work."

This initial site work also had a hard deadline. BJ's could walk away from the lease if the building pad was not turned over to it by the "Outside Building Pad Turnover Date" of December 15, 2023.

After BJ's had possession of the building pad, the lease envisioned that construction would proceed in accordance with the Construction Timetable, and the dates inserted when Phase I site work began. Pacifica had to complete "Phase II Site Work" but BJ's also had tasks under

this timetable.  The Construction Timetable orders the tasks sequentially, and, at times, one party had to complete part of the construction before the other could move forward.   For example, the timetable contemplates that 12 weeks after the Building Site was turned over to BJ's, Pacifica would have completed the fire protection line.  Four weeks later, BJ's would have the structure "dried-in" with the roof in place.  And while BJ's was working on that, Pacifica was meant to prepare the stormwater collection system so BJ's could connect to it.  Similarly, Pacifica had to complete the access road—which the Construction Timetable places 27 weeks after the building site turnover—before BJ's could have the equipment delivered and fixtures installed—anticipated for week 28.

The lease further notes that the failure to meet specific deadlines established by the Construction Timetable would cause BJ's to suffer significant damages.  It therefore sets forth liquidated reimbursement for damages stemming from any delay attributable to Pacifica.  Specifically, if Pacifica did not have Phase I construction completed by September 1, 2023, the "Building Pad Turnover Penalty Date," it would be required to pay BJ's for every day it was late, up to $350,000.  Pacifica was also required to have the permanent utilities connected by the "Utilities Date" and have all the site work completed by the "Site Work Completion Date" established in the Construction Timetable, and a failure to meet these deadlines would entitle BJ's to cumulative rent abatements—two days for every day overdue.

However, from the beginning, construction did not go according to that plan.  By mid-2023, it became clear to both parties that the approvals process was taking much longer than either had originally contemplated.  The Outside Approvals Date, the Building Pad Turnover Penalty Date, and the Outside Building Pad Turnover Date all came and went, and Pacifica still had not been able to obtain all of the needed approvals, with the Highway Occupancy Permit and

3

the Land Development Plans as particular sticking points.

But BJ's, nevertheless, wanted to proceed with the project.  So rather than walking away from the lease, the parties opted to renegotiate certain deadlines and excuse Pacifica from its earlier inability to meet the Building Pad Turnover Penalty Date.  In March 2024, BJ's and Pacifica signed the First Amendment to Lease ("Amendment") which reset both the Outside Approvals Date and Outside Building Pad Turnover Date to June 3, 2024.  The Amendment also excluded the Highway Occupancy Permit from the list of approvals that needed to be obtained by that deadline.  Although the Amendment was silent as to any effect this timing adjustment might have on the Construction Timetable, it did contain a provision that noted that all terms, covenants, and conditions of the original lease except as specifically modified in the First Amendment, "shall remain in full force and effect" and were adopted and reaffirmed by the parties.

With the Highway Occupancy Permit carved out from the other approvals, the parties were able to get the rest of the project on track, at least for a while.  By late April, Pacifica received final approval from the Township for the Land Development Plan and notified BJ's that it had completed Phase I site work.  Although Pacifica was still wrapping up some of the other administrative requirements for the Building Pad Turnover—which it informed BJ's should be completed by the Outside Building Pad Turnover Date of June 3, 2024—the temporary utilities were connected and the worksite was otherwise prepared for BJ's to construct the building.  BJ's took possession of the building pad in late April and started construction—with notice to Pacifica—in early May.

But one thing the parties did *not* do was reengage on the Construction Timetable at the commencement of Phase I construction.  Instead, BJ's looked at the existing timetable, without

consulting with Pacifica, and plugged in the dates that matched the weekly timeline already listed within it, starting with the Building Pad Turnover Date—the actual date of which was ascertainable and was listed as week 0 of the timeline.

BJ's carried on with its construction of the building under this understanding of the timeline. But in August 2024, BJ's learned that Pacifica had not begun—or even engaged a contractor to begin—Phase II site work. When BJ's raised concerns about this to Pacifica, Pacifica acknowledged that the Construction Timetable was triggered upon turnover of the building pad but argued that several administrative tasks that were as of yet uncompleted meant that Building Pad Turnover had not occurred.

By October—around 23 weeks after BJ's started construction of the building—the structure was "dried-in" and construction ground to a halt, unable to progress until Pacifica completed tasks assigned to it—constructing the highway access, putting the fire suppression system in place, and preparing the stormwater and permanent utilities connections. The original Construction Timetable anticipated 24 weeks between building pad turnover and the landlord completing the permanent utilities connections, a timeline that was nigh impossible given Pacifica's lack of progress.

Amidst a dispute related to changes in the plumbing and stormwater plans—and the requisite township approvals that accompanied those changes—and with the specter of litigation hanging over it, Pacifica finally engaged contractors in early November to complete its portion of the remaining construction. It began Phase II site work in early December 2024, around seven months—or 30 weeks—after BJ's took possession of the building site, even though the construction timeline originally had anticipated 31 weeks between the building pad turnover and the landlord *completing* all site work.

Pacifica got regulatory approval for the updated plumbing and stormwater plans in March 2025, and the permanent utilities were finally connected on June 25, 2025.  It completed Phase II site work with the installation of the permanent traffic signal on August 26, 2025, and BJ's was able to open to the public the following Monday, September 1, 2025, nearly a year after what was contemplated based on the original December 2023 Outside Building Pad Turnover Date and the 43-week timetable between building pad turnover and store opening.

Invoking the rent commencement portion of the lease, Pacifica began charging BJ's rent on August 1, 2025.  BJ's protested, claiming it was entitled to cumulative rent abatements from Pacifica's failure to meet the Utilities Date and the Site Work Completion Date in the Construction Timetable.  Pacifica denies that BJ's is entitled to any such abatement, and BJ's has thus far continued to pay each monthly rent installment under protest.

## II.    LEGAL STANDARD

Counterclaims are subject to the same pleading requirements as claims raised in a complaint, and a motion to dismiss a counterclaim for failure to state a claim is evaluated under the same Rule 12(b)(6) framework.  *See, e.g.*, *Barefoot Architect, Inc. v. Bunge*, 632 F.3d 822, 826 (3d Cir. 2011).

To survive a motion to dismiss brought pursuant to Rule 12(b)(6), a pleading must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*  "Threadbare" recitations of the elements of a claim supported only by "conclusory statements" will not suffice.  *Id.* at 683.  Rather, the pleading must allege some facts to raise the allegation above the level of mere speculation.  *Great W. Mining & Min. Co. v. Fox*

6

*Rothschild, LLP*, 615 F.3d 159, 176 (3d Cir. 2010) (citing *Twombly*, 550 U.S. at 555). When analyzing a motion to dismiss, a complaint must be construed "in the light most favorable to the [here, the counterclaim] plaintiff," with the question being "whether, under any reasonable reading of [its] complaint, the [counterclaim] plaintiff may be entitled to relief." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009) (citation omitted). Legal conclusions are disregarded, well-pleaded facts are taken as true, and a determination is made as to whether those facts state a "plausible claim for relief." *Id.* at 210-11.

## III.    DISCUSSION

Pacifica argues, in its motion to dismiss, that BJ's is attempting to hold it liable for failure to meet certain deadlines that were never "established" under the lease. Because, Pacifica posits, BJ's counterclaims rely on this misinterpretation, they cannot be sustained.

### A.  Pennsylvania Law on Contract Ambiguity

Under Pennsylvania law, which all agree applies here, a lease is a contract and is controlled by principles of contract law. *J.K. Willison v. Consol. Coal Co.,* 637 A.2d 979, 982 (Pa. 1994). When, as here, a party challenges the other's right to recovery on the grounds that the contract upon which the claims depend does not mean what the claim alleges, courts must evaluate whether the contract's alleged meaning, as is set forth in the pleading, is warranted under contract principles. *Commonwealth by Shapiro v. UPMC*, 208 A.3d 898, 910 (Pa. 2019) (quoting *Ins. Adjustment Bureau, Inc. v. Allstate Ins. Co.*, 905 A.2d 462, 480 (Pa. 2006)).

The resolution of this motion turns in large part on whether the provisions of the lease agreement at issue here are ambiguous or unambiguous. The interpretation of an unambiguous contract is a question of law, whereas the interpretation of an ambiguous writing is reserved for the finder of fact. *Steuart v. McChesney*, 444 A.2d 659, 663 (Pa. 1982).

The starting point of the analysis is found in the "firmly settled" principle of

Pennsylvania law that "the intent of the parties to a written contract is contained in the writing itself." *Bohler-Uddeholm Am., Inc. v. Ellwood Grp., Inc.*, 247 F.3d 79, 92 (3d Cir. 2001) (citing *Krizovensky v. Krizovensky*, 624 A.2d 638, 642 (Pa. Super. 1993)); *see also Hutchison v. Sunbeam Coal Corp.*, 519 A.2d 385, 390 (Pa. 1986).  Thus, where the parties' intent is clearly expressed, resort to extrinsic evidence is neither necessary nor permitted; rather, the meaning of a clear and unambiguous contract "must be determined by its contents alone." *Steuart v. McChesney*, 444 A.2d at 661 (quoting *E. Crossroads Ctr., Inc. v. Mellon-Stuart Co.*, 205 A.2d 865, 866 (Pa. 1965)).  "Clear contractual terms that are capable of one reasonable interpretation must be given effect without reference to matters outside the contract." *Bohler-Uddeholm America, Inc.*, 247 F.3d at 92 (quoting *Krizovensky*, 624 A.2d at 642).

However, where a contract "is reasonably or fairly susceptible of different constructions and is capable of being understood in more senses than one and is obscure in meaning through indefiniteness of expression or has a double meaning," it will be found ambiguous.  *Duquesne Light Co. v. Westinghouse Elec. Corp.,* 66 F.3d 604, 614 (3d Cir. 1995) (quoting *Samuel Rappaport Fam. P'ship v. Meridian Bank,* 657 A.2d 17, 21-22 (1993)) (internal quotation marks omitted).  Although in determining whether ambiguity exists courts may consider "the words of the contract, the alternative meaning suggested by counsel, and the nature of the objective evidence to be offered in support of that meaning," *Mellon Bank, N.A. v. Aetna Bus. Credit, Inc.,* 619 F.2d 1001, 1011 (3d Cir.1980), a disagreement between the parties as to the proper interpretation of the contract, alone, does not render it ambiguous, *Duquesne Light Co.,* 66 F.3d at 614.  Thus, in considering the motion to dismiss, Pacifica's motion can only be granted if the provisions of the lease agreement at issue in BJ's counterclaims unambiguously state what Pacifica says they do.

### B.  Parties' Interpretation of the Lease

In interpreting the terms of a contract, the contract must be considered as a whole. *Commonwealth by Shapiro*, 208 A.3d at 911.  Effect must be given to every provision, and one portion of the contract cannot be interpreted to nullify another.  *Id.*  So too must words be given their ordinary, everyday meanings unless the contract indicates otherwise.  "Courts in interpreting a contract do not assume that its language was chosen carelessly." *Steuart,* 444 A.2d at 662 (quoting *Moore v. Stevens Coal Co.,* 173 A. 661, 662 (Pa. 1958)).  "Neither can it be assumed that the parties were ignorant of the meaning of the language employed." *Id.* (citing *Fogel Refrigerator Co. v. Oteri,* 137 A.2d 225, 231 (Pa. 1958)).  The crux of the parties' disagreement here centers on Schedule 4.1B, the Construction Timetable—which was incorporated and explicitly referred to in the lease.

SCHEDULE 4.1B

CONSTRUCTION TIMETABLE

(Mechanicsburg, PA)
(8-22-22)

**Week No.**

| Week No. | Description |
|---|---|
| -1 | Landlord's Building Pad certification to Tenant. |
| 0 | Building Pad Turnover Date - Landlord completes temporary utilities and access to the staging area(s), the Building GC's trailer and Building Pad.  Conduct kick-off and pre-construction meetings.  Landlord erects "Coming Soon" sign. |
| 12 | Landlord completes fire protection line to 12" above finished floor in location designated on MEP plans. |
| 16 | Roof is on and building is "dried-in".  Landlord storm water collection system ready for Tenant's connections. |
| 24 | Landlord utilities complete - permanent power, gas, water and sewer are fully certified and operational. |
| 27 | Landlord completes access road to Building for Tenant tractor trailer delivery of equipment.  Freestanding signs complete and ready for Tenant's panel installation. |
| 28 | Fixture Installation Start Date.  Landlord's on and off site work are substantially complete.  Paving, striping and landscaping are complete.  The truck dock/receiving area and access is complete and fully operational. |
| 31 | Compactor Installation begins. |
| 31 | Landlord's on and off site work completion date.  Cart corral installation begins.  Punchlist developed for Landlord's sitework. |
| 36 | Temporary/permanent C of O in hand.  Commence Building commissioning. |
| 38 | Merchandising begins.  Site punchlist items complete. |
| 42 | Soft Opening |
| 43 | Grand Opening - Saturday - Rent Commencement Date |
| 51 | Project Close-Out.  Final close-out documents, final lien waivers, warranty docs, final pay application, etc. received and processed. |
| 58 | Refrigeration Warranty Walkthrough |
| 82 | Landlord site walk-thru - One Year Warranty. |

9

BJ's claims are premised on the assumption that the timeline—agreed to at the inception of the contract and affirmed in the First Amendment of the Lease—was binding, even if the particular dates were to be inserted later. Thus, when the permanent utilities were not connected 24 weeks after the building pad was turned over, the reimbursement provisions for failure to meet the Utilities Date—the day upon which all water, electricity, and gas lines and sewerage disposal and drainage are available—was triggered. And when Pacifica had not completed all of its site work 31 weeks after building pad turnover, the provision for the failure to meet the Site Work Completion Date—the day all Phase I and Phase II site work is considered complete per the Construction Timetable and design criteria manual—was triggered. Each of these provisions provides for cumulative liquidated damages, which specifically—by the terms of the contract—was not a penalty but reimbursement, for the "significant damages" BJ's alleges it suffered due to the delay.

Pacifica challenges this interpretation, focusing on language in the lease agreement that required the parties to "revise" the Construction Timetable at the commencement of Phase I construction. Pacifica argues that this provision required the parties to reengage when they started Phase I site work and collaborate to set "appropriate" dates—*i.e.*, dates determined at that time based on real world construction conditions. Without this collaborative step, then, Pacifica argues that the Construction Timetable was only a nonbinding template, and the two deadlines that trigger the damages provisions at issue—the Utilities Date and Site Work Completion Date—were never "established" under the lease.

### C. Interpretation of the Lease

#### i. *Section 4.1(h) and the Construction Timetable*

Section 4.1(h) provides that:

Once Landlord commences the Phase I Site Work, the Construction Timetable attached

10

hereto as Schedule 4.1B will be revised by Landlord and Tenant to insert the appropriate dates keyed off the commencement of Phase I Site Work.

The first question is the "when": When, according to provision 4.1(h) does the provision kick in?  The contract unambiguously provides that it is once the "Landlord", *i.e.* Pacifica, commences the Phase I Site Work.

The next question is what is to be done once such work commences.  The contract states simply that the Construction Timetable will be "revised".  So, given the well-established canon of Pennsylvania contract interpretation that "[i]f left undefined, the words of a contract are to be given their ordinary meaning."  *Kripp v. Kripp*, 849 A.2d 1159, 1163 (Pa. 2004) (citing *Pines Plaza Bowling, Inc. v. Rossview, Inc.,* 145 A.2d 672, 676 (Pa. 1958), what do the dictionaries say about the word "revised"?   They say revise means "to look over again or make changes in order to correct or improve" or "to make a new, amended, improved, or up-to-date version of."  *Revise*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/revise (last accessed Mar. 25, 2026); *see also Revise*, Oxford English Dictionary, https://www.oed.com/dictionary/revise_v (last accessed Mar. 25, 2026) ("To examine or re-examine (something, esp. a law, code, plan, or the like) for the purpose of improvement or amendment; to alter so as to make more efficient, apposite, or effective.")

So – who is to make such revisions?  The contract is crystal clear, that this task is to be undertaken by the Landlord (Pacifica) and the Tenant (BJ's) – not one, but both of them must revise the Construction Timetable.  Throughout the contract, the duties of each party are clearly delineated, with the contract describing everything from what the tax duties each will assume, to allocating to common shopping area maintenance duties, to outlining what types of insurance each must carry and when the policies must take effect.  Thus, a provision that requires both parties to do something stands out.  It imparts a duty on both to revise the timetable: neither can

do so independently and impose those dates on the other.

The question of what they are to revise is seen in the phrase "to insert the appropriate dates" – they are together to revise the Construction Timetable to include in it "the appropriate dates" which numbers are to be "keyed off" of the commencement of the Phase I Site Work. And here is where the parties part ways.  Pacifica argues that the contract provides that the provision allows the parties to engage in a full negotiation of the dates on which tasks should be completed based on real world construction conditions.  BJ—to the contrary—maintains it provides no such thing:  In BJ's view the timeline was set by the parties in the Construction Timeline which provides that each task happens a certain number of weeks after the task before it.  The specific completion dates (rather than the timeframe for completion which was to remain as negotiated) were, in BJ's interpretation of the contract, to be inserted later.

The use of the term "keyed off" supports BJ's interpretation.  The term is not defined in the parties' agreement.  Neither—given that it is an idiomatic term not a word—have the parties provided a dictionary definition.  But Merriam-Webster does define "Keyed to" which means "to make something suitable for a particular use" or "to change something in a way that is closely related to something else."  *Key to*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/keyed%20to (last accessed Mar. 25, 2026).  And, web-based "The Free Dictionary", under the idioms section, defines "Keyed off" to mean "to use a particular piece or source of information as the basis for some function, action, thought process, etc."  *Key off*, The Free Dictionary, https://idioms.thefreedictionary.com/keyed+off (last accessed Mar. 25, 2026).

The Construction Timetable, as incorporated into the lease, contains a timeline in terms of weeks, not specific calendar dates.  This reflects the parties' initial uncertainty about how long the approvals process would take and when Pacifica would become obliged to begin Phase I

construction.  This timetable, as it existed when the lease was signed, then, cannot be said to "establish" any dates.  Instead, as discussed above, at the start of Phase I construction, the parties were meant to revise that timetable to insert the dates, thereby affixing or "establishing" them for the purpose of the Failure to Satisfy Deadlines provisions.  Because the parties did not both make this revision, under a plain meaning reading of the contract, these dates were never "established" and therefore cannot bind Pacifica.

The natural and ordinary reading of the section, then, can be taken as a coherent whole.  Both the parties share a duty to make changes to the Construction Timetable to add in real dates, without changing the overall timeline of construction.  Further, while requiring the participation of both BJ's and Pacifica, it does not contemplate a renegotiation of the timelines set forth in the Construction Timetable.

### ii.    Failure to Satisfy Deadlines

The Failure to Satisfy Deadlines provisions, Sections 4.2(d)(ii) [1] and (iii),[2] impose damages if Pacifica fails to meet the Utilities Date and the Site Work Completion Date "established in Schedule 4.1B."  But a central point of the parties' disagreement, is whether these dates were ever actually "established" per the terms of the contract.  As discussed above, under a plain meaning interpretation of the contract, the parties did not together revise Schedule 4.1B to set actual calendar dates keyed off the commencement of Phase I Site Work, thus the Utilities Date and Site Work Completion Date were never "established" within the meaning of Sections

---

[1] Section 4.2(d)(ii) provides that "if the Utilities Date does not occur by the Utilities Date established in Schedule 4.1B, then no Minimum Rent shall be payable for the period beginning on the Rent Commencement Date and continuing for twice the number of days between the Utilities Date and the actual Utilities Date."

[2] Section 4.2(d)(iii) provides that "if the Site Work Completion Date shall not occur by the Site Work Completion Date established in Schedule 4.1B, then no Minimum  Rent shall be payable for the period beginning on the Rent Commencement Date and continuing for twice the number of days between the number of days between [sic] the Site Work Completion Date and the actual Site Work Completion Date."

13

4.2(d)(ii) and (iii), and those liquidated-damages provisions have not been triggered.

### D. Latent Ambiguity

Although the terms of Section 4.1(h) are unambiguous, the question remains open, however, as to whether the parties' <u>performance</u> tenders a latent ambiguity.

There are two types of contract ambiguity: patent and latent. A patent ambiguity appears on the face of the instrument itself. *Bohler-Uddeholm Am., Inc.*, 247 F.3d at 93. A latent ambiguity, by contrast, "arises from extraneous or collateral facts which make the meaning of a written agreement uncertain although the language thereof, on its face, appears clear and unambiguous." *Id.* (quoting *Duquesne Light*, 66 F.3d at 614). Although a party may rely on extrinsic evidence to establish a latent ambiguity, such an inquiry must remain tethered to the contractual language and may not be used merely to show that the parties intended something different from what was expressed in the agreement. *Id.*

In *Bohler-Uddeholm America, Inc.*, the Third Circuit discussed the tension between: (1) the instruction to interpret an unambiguous contract without the use of extrinsic evidence; and, (2) the need to examine extrinsic evidence to determine if a latent ambiguity exists. 247 F.3d at 93-94. It balanced these precepts by only allowing the consideration of extrinsic evidence of a certain nature—that which supports a reasonable alternative interpretation under the principles of Pennsylvania contract law. *Id.* at 93-96. However, this alternative interpretation cannot be wholly detached from the text of the contract itself, but it must be a lens though which to determine the meaning of some specific term or terms contained therein. "[L]est the ambiguity inquiry degenerate into an impermissible analysis of the parties' subjective intent, such an inquiry appropriately is confined to 'the parties linguistic reference.' . . . [T]he parties' expectations, standing alone, are irrelevant without any *contractual hook* on which to pin them." *Id.* at 93 (quoting *Duquesne Light*, 66 F.3d at 614 & n.9) (emphasis in original).

14

If a "court determines that a party has offered extrinsic evidence capable of establishing latent ambiguity, a decision as to which of the competing interpretations of the contract is the correct one is reserved for the factfinder, who would examine the content of the extrinsic evidence (along with all the other evidence) in order to make this determination.". *Bohler-Uddeholm Am., Inc.*, 247 F.3d at 95 (citing *Mellon Bank,* 619 F.2d at 1011, 1013-14).

Here, BJ's argues that there is extrinsic evidence that supports its claim that dates were automatically inserted, and thus "established" in the construction timetable. It points to the back-and-forth with Pacifica in August and early September 2024, after learning that Pacifica was not making progress on its portion of the site construction. In these discussions, Pacifica acknowledged that the timetable was binding—both parties operating as though the dates would be automatically inserted and thus "established" upon building pad turnover—but argued that the timetable had not yet begun to run because *technically* the Building Pad Turnover Date had not occurred, even though BJ's had physical possession of the site and had started constructing the building. This technicality relied on by Pacifica was based on deficits in its own performance— it had not completed some of the administrative tasks required for Building Pad Turnover— despite its earlier representations that all of those requirements would be completed no later than June 3, 2024.

These facts alleged by BJ's, plausibly,[3] present an latent ambiguity.[4] Although the text of Section 4.1(h) requires a joint effort to add the dates to the Construction Timetable, this extrinsic evidence as to the course of performance suggests that throughout the summer and fall of 2024,

---

[3] Although BJ's Answer and Counterclaims purport to attach the documents supporting these claims, the exhibits it claims are not, in fact, attached, and the court relies only on what is asserted in the pleading.

[4] Pacifica does not meaningfully respond to this argument, relying solely on the language of the contract and arguing that BJ's is "conjuring up latent ambiguity." But in doing so it fails to acknowledge the necessity for courts to consider *some* extrinsic evidence if it creates an alternative, reasonable interpretation of the text, even if that interpretation is contrary to its natural reading. *See Bohler-Uddeholm Am., Inc.*, 247 F.3d at 93-96.

both BJ's and Pacifica hewed to an alternative interpretation of the text: to wit, that "Landlord and Tenant" could independently but simultaneously "insert" the dates into the Construction Timetable, and that doing so was sufficient to "establish" them for the purposes of the Failure to Satisfy Deadlines provisions.

These conflicting interpretations leave open the question of whether, and if so when, binding dates were established in the Construction Timetable.  Because this issue remains unresolved, Pacifica's Motion to Dismiss must be denied.

An appropriate order follows.

**BY THE COURT:**

S/ WENDY BEETLESTONE

**WENDY BEETLESTONE, C.J.**

Courts may look to the dictionary definitions to determine the "ordinary meaning" of a term. *Darrington v. Milton Hershey Sch.*, 958 F.3d 188, n.8 (3d Cir. 2020) (citing *Commonwealth ex. rel. Shapiro*, 208 A.3d at 906); *accord Aleynikov v. Goldman Sachs Group, Inc.*, 765 F.3d 350, 360 (3d Cir. 2014) ( "dictionaries are the customary reference source that a reasonable person in the position of a party to a contract would use to ascertain the ordinary meaning of words not defined in the contract").

Although here, Pacifica takes pains to cite the dictionary definitions of "will" and "revised" and "appropriate" and "commence," it ignores the word "insert," instead reading it as "set" or "establish" or "develop."  But "insert" has a meaning distinct from that suggested by Pacifica: *i.e.*, the creation of a new timetable with little or no regard to what the existing document already contains.  Instead, "insert," means "to put or thrust in,"[5] and implies putting the information—in this case the dates—as an addition; it does not mean changing or replacing what is already there—the timetable in number of weeks.

Nor is there a tension between the use of the word insert and the definitions of "will" or "revised" or "appropriate."  Because the approvals timeline was inherently uncertain and upon drafting of the contract it was not clear when Phase I construction would commence, the use of the word "appropriate"—meaning fitting[6]—acknowledges this uncertainty around when Pacifica would become obliged to begin construction.

---

[5] The definitions of "insert" from the Merriam-Webster are "1. To put or thrust in. 2. To put or introduce into the body of something: interpolate. 3. To set in and make fast. 4. To place into action (as in a game).  *Insert*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/insert (last visited Mar. 17, 2026).  Likewise, the Oxford English Dictionary defines "insert" as "To set, put, or place in; to push or thrust in; to fix or fix in; to introduce; to ingraft. Said primarily of putting any solid object into a space which it fits, or fills up; hence to place a thing, as an addition, between the parts of another, as to insert a page or plate into a book. . ."  *Insert*, Oxford English Dictionary, https://www.oed.com/dictionary/insert_v (last visited Mar. 23, 2026).

[6] *Appropriate*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/appropriate, (last visited Mar. 17, 2026).